[Cite as *State v. Adams*, 2011-Ohio-5361.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO.    08 MA 246 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | O P I N I O N |
| | ) | |
| BENNIE ADAMS, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:    Criminal Appeal from Common Pleas
Court, Case No. 07CR1261.

JUDGMENT:    Affirmed.

APPEARANCES:
For Plaintiff-Appellee:    Attorney Paul Gains
Prosecuting Attorney
Attorney Ralph Rivera
Attorney Martin Desmond
Assistant Prosecuting Attorneys
21 West Boardman Street, 6th Floor
Youngstown, Ohio  44503

For Defendant-Appellant:    Attorney John Juhasz
Attorney Lynn Maro
7081 West Boulevard, Suite 4
Youngstown, Ohio  44512

JUDGES:
Hon. Joseph J. Vukovich
Hon. Gene Donofrio
Hon. Cheryl L. Waite

Dated:  October 14, 2011

VUKOVICH, J.

¶{1}  Defendant-appellant Bennie Adams appeals from his conviction of aggravated murder and the accompanying death sentence which was entered in the Mahoning County Common Pleas Court.  He sets forth twenty-one assignments of error in a brief spanning five hundred twenty-eight pages.  For the following reasons, the judgment of the trial court is hereby affirmed.

## STATEMENT OF THE CASE

¶{2}  Gina Tenney was a nineteen-year-old university student living in a duplex apartment on Ohio Avenue in Youngstown.  Appellant Bennie Adams lived with his girlfriend in the apartment below.  Ms. Tenney broke up with her boyfriend in the fall of 1985 at which time appellant began calling her.  She eventually changed her telephone number.  On December 25, 1985, someone tried to break into Ms. Tenney's apartment.  On December 28, 1985, she reconciled with her boyfriend, and he stayed overnight.

¶{3}  He left her apartment at 1:00 p.m. on December 29.  (Tr. 121-122).  She then went to a movie and dinner with a friend and started for home between 4:30 and 5:00 p.m.  (Tr. 140, 143).  That evening, Ms. Tenney telephoned her mother in Ashtabula and asked her to come get her because she was "in the wrong place."  At 9:30 p.m., someone used her ATM card multiple times at a bank, entering that deposits were being made while placing empty envelopes in the machine and making four unsuccessful withdrawal requests.  (Tr.168, 260-263).

¶{4}  On the morning of December 30, 1985, the body of Gina Tenney was discovered in the Mahoning River, a few miles from her residence.  There were ligature marks on her neck and wrists, and rape kit swabs revealed the presence of semen.  (Tr. 417, 471, 575).  Police arrived at Ms. Tenney's apartment to look for evidence.  Her car was parked in front.  (Tr. 161).  Appellant let the police into the apartment's common area.  He then let them into his apartment to use his telephone to call the landlord in order to unlock Ms. Tenney's apartment.  (Tr. 147-148).

¶{5}  While in appellant's apartment, an officer recognized Horace Landers as a person with an outstanding arrest warrant.  A shirtless Mr. Landers was handcuffed and provided with a shirt and what the police believed was his jacket.  The jacket was searched for safety reasons before it was placed on Mr. Landers, and a detective

found Ms. Tenney's ATM card and a welfare card containing appellant's name in the pocket. (Tr. 151). Contemporaneously, Mr. Landers stated that the jacket belonged to appellant.

¶{6} The police arrested appellant for receiving stolen property. Appellant's girlfriend, who was the main tenant, gave consent to search the apartment. Ms. Tenney's television, upon which appellant left his fingerprints, was sitting on a bed. (Tr. 158-159, 200). Ms. Tenney's keychain, containing her house and car keys, was found in the bathroom trash. (Tr. 155-156). In another trash can, police found a potholder that matched a potholder found in Ms. Tenney's apartment. (Tr. 157). Samples from this potholder disclosed red pubic and head hair consistent with that of Ms. Tenney and hair fragments belonging to an African-American. (Tr. 562-563).

¶{7} Police interviewed the Allies, a couple who used the ATM immediately after Ms. Tenney's card had been used. They stated that the person using the ATM was a black male who had a scarf covering most of his face and who did not seem to know what he was doing. (Tr. 294-295, 312). On January 2, 1986, Mr. Allie picked Ms. Tenney's car out at the police garage by sight and sound as being the one driven by the ATM user. (Tr. 170-171, 217, 297-298, 313). On January 8, 1986, the Allies attended a line-up containing appellant and Mr. Landers. (Tr. 307). Mr. Allie would not identify anyone at the time, and Mrs. Allie identified Mr. Landers. (Tr. 338-339).

¶{8} A short time later, Mr. Allie called the detective to express that they knew which person in the line-up was the ATM user, but they were afraid to identify him at the time because too many people were watching them. (Tr. 299, 307, 314-315, 317, 325). Mr. Allie testified that he knew appellant from the neighborhood and that he recognized him as soon as he turned from the ATM machine. (Tr. 290, 309-310). In fact, he stated that appellant put his hand on the hood of their car and waved. (Tr. 294-295). Mrs. Allie testified that she identified Mr. Landers at the station because she was terrified with the set up and he was the opposite of appellant, whom she later identified from a photograph of the line-up. (Tr. 325, 327).

¶{9} In February of 1986, BCI testing of the semen found on the victim's underwear excluded Mr. Landers and Ms. Tenney's boyfriend but did not exclude appellant. The combination of Type B and non-secretor indicators was said to occur in four percent of the black population of which appellant was a member. (Tr. 556-557).

¶{10} Appellant's receiving stolen property charge was presented to a grand jury on February 21, 1986. However, a no bill was returned, which apparently made the prosecution leery of presenting a murder charge to the grand jury at that time. In 1989, samples were sent to Virginia for DNA testing. The results stated that the semen was consistent with appellant but was also consistent with 8% of the Caucasian population and 12% of the black population. Thus, the statistics were now even worse for the state's case.

¶{11} In 2007, the forensic evidence was submitted to BCI for retesting with new technology. DNA standards were recovered from the rape kit swabs. Appellant was arrested on October 4, 2007 to ensure that a search warrant could be executed to obtain his DNA. The results came back positive on October 11, 2007.

¶{12} Appellant was immediately indicted for aggravated murder, rape, aggravated burglary, aggravated robbery, and kidnapping. (Tr. 582, 587). A death specification was thereafter added by a superseding indictment, which alleged that he committed the aggravated murder while committing, attempting, or fleeing immediately after committing or attempting to commit one of the other enumerated underlying felonies and that he was the principal offender. Appellant filed various motions, most of which were denied. On July 28, 2008, the court dismissed counts two through five (the underlying felonies) on statute of limitations grounds. The trial for aggravated murder proceeded through most of October of 2008.

¶{13} On October 22, 2008, the jury returned a verdict of guilty on the aggravated murder charge and on the death specification. On October 29, 2008, the jury recommended a death sentence. On November 5 and 6, 2008, the court adopted this recommendation and filed an opinion weighing the various statutory factors. A timely appeal was filed with this court. Appellant filed a brief containing 528 pages. Appellant sets forth twenty-one assignments of error, which shall be grouped into four main sections: pretrial issues, jury selection issues, trial issues, and penalty phase issues.

**PRETRIAL ISSUES**

¶{14} The pretrial issues are contained in the following six assignments of error: three, four, and eleven (dealing with suppression) and five, twelve, and thirteen (dealing with delay).

ASSIGNMENT OF ERROR NUMBER THREE

¶{15} Appellant's third assignment of error alleges:

¶{16} "APPELLANT'S CONVICTIONS AND SENTENCES ARE IN VIOLATION OF THE STATE AND FEDERAL CONSTITUTIONS BECAUSE APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO FILE A MOTION TO SUPPRESS EVIDENCE, AND UNRELIABLE EYEWITNESS TESTIMONY WAS ADMITTED AGAINST APPELLANT AT TRIAL [CITATIONS OMITTED]."

¶{17} We review a claim of ineffective assistance of counsel under the two-part test articulated in *Strickland v. Washington* (1984), 466 U.S. 668. Specifically, a reviewing court will not deem counsel's performance ineffective unless a defendant can show his lawyer's performance fell below an objective standard of reasonable representation and that prejudice arose from the lawyer's deficient performance. *State v. Bradley* (1989), 42 Ohio St.3d 136.

¶{18} To show prejudice, a defendant must prove that, but for his lawyer's errors, a reasonable probability exists that the result of the proceedings would have been different. Id. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Prejudice may not be assumed but must be affirmatively shown. See *State v. McGee*, 7th Dist. No. 07MA137, 2009-Ohio-6397, ¶13.

¶{19} When considering an ineffective assistance of counsel claim, the reviewing court should not consider what, in hindsight, may have been a more appropriate course of defense. See *State v. Phillips* (1995), 74 Ohio St.3d 72, 85. Our review of counsel's action is highly deferential as there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Id.

¶{20} Trial counsel's failure to file a motion to suppress does not necessarily constitute ineffective assistance of counsel. *State v. Madrigal* (2000), 87 Ohio St.3d 378, 389. However, the failure to file a motion to suppress may constitute ineffective

assistance of counsel when the record demonstrates that the motion would have been granted. *State v. Barnett*, 7th Dist. No. 06-JE-23, 2008-Ohio-1546, ¶31.

¶{21} Appellant argues that counsel should have moved to suppress the eyewitness identification regarding his use of the ATM machine because the totality of the circumstances shows that their identification of appellant was unreliable. He cites Mr. Allie's failure to identify anyone at the line-up and Mrs. Allie's original identification of Mr. Landers and notes that the ATM user's face was mostly covered with a scarf. See *Neil v. Biggers* (1972), 409 U.S. 188, 198 (listing reliability factors such as the opportunity to view the defendant at the time of the crime, the degree of attention, the accuracy of prior description, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation). See, also, *Manson v. Brathwaite* (1977), 432 U.S. 98, 114-16 (stating that the factors are weighed against the issues with the procedure which were previously found to be problematic).

¶{22} The state responds that the identification was reliable because the Allies sufficiently explained why they did not identify appellant at the line-up: the room was bright and filled with random people who would bear witness to their identifying a murderer. The state points out although the bottom half of appellant's face was covered, the Allies had a good opportunity to view appellant. Moreover, Mr. Allie stated that he already knew appellant from the neighborhood and had a high level of certainty concerning his identification. The state also notes that the length of time between the initial encounter and the ultimate identification was not lengthy. It is also noteworthy that Mr. Allie showed a high degree of attention by identifying the car by both sight and sound. In addition, testimony showed that they were worried about approaching the ATM while appellant was present. Thus, a court could reasonably find that their identification was not unreliable.

¶{23} In any event, convictions based on eyewitness identifications at trial following pretrial identification by photograph will be set aside only if the identification procedure was so impermissibly suggestive so as to give rise to a very substantial likelihood of irreparable misidentification. See *McGee*, 7th Dist. No. 07MA137 at ¶18. Even if the procedure was unduly suggestive, the identification can still be admitted if it is reliable under the totality of the circumstances. Id. at ¶19. **However, if the procedure was not unduly suggestive, then the reliability prong of the test never**

**arises**. *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, ¶19 ("[w]hen a witness has been confronted with a suspect before trial, due process requires a court to suppress her identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt *and* the identification was unreliable under all the circumstances," noting the special emphasis placed on "and"); *State v. Murphy* (2001), 91 Ohio St.3d 516, 534; *State v. Waddy* (1992), 63 Ohio St.3d 424, 439. See, also, *Manson*, 432 U.S. at 114-16 (noting that the factors are to be weighed against the corruptive effect of the suggestive identification, meaning that if the suggestiveness was not improper, there is nothing to weigh the factors against, i.e. the factors are irrelevant if there was not a suggestive identification).

¶{24} Appellant makes absolutely no argument that there were unduly suggestive police procedures implemented here or that something was inherently wrong with the line-up itself, and nothing in the record indicates that such an argument could be made here. Rather, appellant argues only about the reliability of the identification made by the witnesses. Since reliability is not a pretrial suppression issue unless the procedure is alleged and found to have been unduly suggestive, appellant's argument is without merit. Thus, reliability was not a matter for suppression here but was instead a matter of weight and credibility for trial. This assignment of error is overruled.

<u>ASSIGNMENT OF ERROR NUMBER FOUR</u>

¶{25} Appellant's fourth assignment of error argues:

¶{26} "THE TRIAL COURT ERRED IN FAILING TO SUPPRESS ITEMS SEIZED BY THE POLICE ON DECEMBER 30, 1985 FROM THE RESIDENCE OF THE APPELLANT, AS SAID SEIZURES WERE [UNCONSTITUTIONAL] [CITATIONS OMITTED]."

¶{27} After finding the victim's body in the Mahoning River on the morning of December 30, 1985, police went to her apartment on Ohio Avenue. Appellant let the officers into the common area of the building. They discovered that the victim's apartment door was locked. One of the detectives once lived in the building, and he knew the landlord. The officers asked appellant, who was staying in the downstairs apartment, if they could use his telephone to call the landlord about obtaining keys. Appellant consented and let them into his apartment. (Supp.Tr. 4-5). The officers

then asked some standard questions about the victim and asked if anyone else was home who may have seen anything unusual. Appellant told the police in a mumbling tone that he was alone at which point the officers heard a noise described as a bump or a crash from a bedroom that sounded like a door hitting a wall. (Supp.Tr. 5). Appellant then declared, "I never said he wasn't here." (Supp.Tr. 5, 10).

¶{28} The police checked the bedroom for safety reasons and found Horace Landers standing there without a shirt. (Supp.Tr. 5, 12-13). One of the officers knew that Mr. Landers had an outstanding warrant. The police placed him under arrest, cuffing his hands behind his back. (Supp.Tr. 5, 22). As he was going to be taken outside to wait for transport, a detective asked Mr. Landers where his shirt was, and he indicated one on the bed, which the detective then picked up and draped over Mr. Landers' shoulders. (Supp.Tr. 5).

¶{29} As it was winter, the detective picked up a jacket on the floor just outside the bedroom doorway three to four feet from Mr. Landers. (Supp.Tr. 5-6, 20). The detective commenced searching it for weapons as he asked Mr. Landers if the jacket was his. The detective felt something hard and sharp in the jacket pocket, and pulled out Gina Tenney's ATM card. (Supp.Tr. 6, 24, 27, 29). Mr. Landers responded that the jacket belonged to appellant, and a welfare card issued in appellant's name and found with the ATM card confirmed this answer. (Supp.Tr. 6).

¶{30} On September 5, 2008, appellant filed a motion to suppress the ATM card. First, the motion argued that officers did not have permission to search appellant's residence just because they had consent to enter it. Second, the motion argued that Horace Landers had been immediately handcuffed and the jacket was outside of the room so there was no danger that he would retrieve a weapon so as to justify a search incident to arrest. The motion acknowledged that the coat could have been searched if Mr. Landers had asked to wear it to jail. After the above facts were elicited at a hearing, the trial court overruled appellant's motion to suppress the ATM card.

¶{31} Appellant acknowledges that he cannot assert the rights of Horace Landers as to the propriety of the arrest[1] but urges that he can assert the propriety of

---

[1] See, e.g., *United States v. Salvucci* (1980), 448 U.S. 83, 87-88; *Rakas v. Illinois* (1978), 439 U.S. 128, 133-34 (Fourth Amendment rights are personal rights which may not be vicariously asserted).

the officer's movement within his residence and the search and seizure of items within it. Appellant specifies that the police had consent to enter his apartment for the limited purpose of using the telephone but did not have consent to investigate the source of a noise. He insists that they were not acting under exigent circumstances which could justify their movement within his residence.

¶{32} If police were permitted to move to the bedroom to investigate, appellant argues that the seizure and search of the jacket does not fall under the search incident to arrest exception to the warrant requirement, claiming that it was not in the immediate control of Mr. Landers because it was outside of the room and because Mr. Landers had been handcuffed behind his back. As to the detective's intent to place the coat on Mr. Landers, appellant essentially argues that there is no "keep an arrestee warm" exception to the warrant requirement, at least where the arrestee does not indicate that he wants to wear the coat or that the coat belongs to him[2].

¶{33} Appellate review of a suppression decision presents a mixed question of law and fact. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶100. On factual matters, the trial court occupies the best position to evaluate the credibility of witnesses and weigh the evidence. Id., citing *State v. Mills* (1992), 62 Ohio St.3d 357, 366. Thus, factual findings are accorded great deference. Id., citing *State v. Fanning* (1982), 1 Ohio St.3d 19, 20. The trial court's legal conclusions are reviewed de novo. Id., citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8.

¶{34} Unreasonable searches and seizures are constitutionally prohibited. Ohio Const. Sec. 14, Art. I; U.S. Const. Amend. IV and XIV; *Maryland v. Buie* (1990), 494 U.S. 325, 331; *State v. Robinette* (1997), 80 Ohio St.3d 234, 238-239. For a search or seizure to be reasonable, it must be supported by a warrant or based upon an exception to the warrant requirement. *Katz v. United States* (1967), 389 U.S. 347, 357. Valid exceptions to the warrant requirement include: search of arrestee's immediate area incident to arrest; inventory search; consent; investigatory stop with

---

[2]See *State v. Cherry*, 9th Dist. No. 21304, 2003-Ohio-3146, ¶6, 12-13 (officers properly searched jacket pockets before putting it on arrestee where he was asked if he wanted to take a jacket with him to jail and where he stated he would like to take his black overcoat with him); *State v. Elkins* (Apr. 5, 1984), 8th Dist. No. 47319 (officers properly searched jacket pockets where arrestee identified jacket found in vacant apartment as his and where police were using it to transport in cold weather).

protective search incident to arrest or incident to investigatory stop; hot pursuit; exigent circumstances; and plain view.

¶{35} The state has the burden to show voluntary consent by clear and positive evidence based on the totality of the circumstances. *State v. Posey* (1988), 40 Ohio St.3d 420, 427. See, also, *State v. Barnes* (1986), 25 Ohio St.3d 203, 208-209 (the standard is less strict than that required to show waiver of Fifth or Sixth Amendment rights as the waiver need not be knowing and intelligent). Consent to enter premises does not equate with consent to search the premises. *Lakewood v. Smith* (1965), 1 Ohio St.2d 128, 131. "A person who admits a police officer to his premises in compliance with the officer's request for an interview does not thereby waive his constitutional immunity from unreasonable searches, nor does he thereby consent to a search of the premises." Id. at ¶1 of syllabus.

¶{36} It is conceded that appellant voluntarily granted consent to enter his apartment to assist in a murder investigation and to allow the police to telephone the landlord. Before placing the call, they asked appellant questions about the victim and queried whether anyone else was home that may have information about the victim. Appellant answered in the negative in a mumbling voice. The police were then confronted with a crash sounding like a door hitting a wall, and appellant then contradictorily states, "I never told you he wasn't here." The content and timing of this statement suggests that the person in the backroom is the person the police are looking for in the victim's death.

¶{37} Considering that the upstairs neighbor was just discovered floating in the Mahoning River and that appellant (or someone else from that apartment) was a suspect in an attempted burglary at that neighbor's apartment just five days before, this set of circumstances would cause a reasonable officer to fear for their safety and would seem to justify glancing in the room from which the noise emanated in order to ascertain its occupant. See *State v. Clark*, 6th Dist. No. W-09-009, 2010-Ohio-2383, ¶27 (when a suspect of a violent crime gives officers consent to enter to speak with him and then he walks to bedroom to put on clothes, officers can permissibly follow him to ensure their safety).

¶{38} A *Terry*-type analysis may also be applied here. That is, the officers, who indisputably had valid consent to enter the residence (Apt. Br at 109), had

reasonable suspicion to investigate what appellant knew about the victim's whereabouts. That is, he lived below the victim, who had just been found floating in the river with ligature marks, and he was a person of interest in the attempted burglary of the victim's apartment occurring a mere five days before her murder. Notably; there had been two attempts to gain entry into Ms. Tenney's apartment which occurred in the middle of the night while the victim was home sleeping, suggesting an intent to do more than merely steal. During their investigation of the victim's murder, the officers heard the crash of a door behind them when they were given the impression by appellant that he was alone. Appellant's statement after the noise was heard would further engender suspicion that a murderer was about to jump out of the bedroom.

¶{39} The totality of these circumstances created a reasonable suspicion, that a weapon could be used against them, which would allow the police to frisk appellant. *Terry v. Ohio* (1968), 392 U.S. 1, 29, 30. They can also conduct a protective search of a limited area for weapons. See *Michigan v. Long* (1983), 463 U.S. 1032, 1047 (*Terry* not limited to a frisk of the body of the person being investigated). Where the source of the officer's most immediate fear came from another direction, the permissible frisk zone increased to view the source of the noise in order to ensure officer safety during the investigation. See *State v. Bobo* (1988), 37 Ohio St.3d 177, 180-181 (police can sweep area around stopped individual to allow officer to conduct investigation in safety; allowing officer to search under stopped motorist's seat). Notably, officer safety is a special concern when in a suspect's house as compared to a public place. *Maryland v. Buie* (1990), 494 U.S. 325, 333. See, also, *State v. Blackwell*, 159 Ohio App.3d 790, 2005-Ohio-922, ¶11 (frisk after consent to enter to speak with suspect); *State v. Lyons* (1992), 83 Ohio App.3d 525, 533.

¶{40} In *Buie*, the defendant was arrested in his residence based upon an arrest warrant. Thereafter, officers conducted a protective sweep around the house to ensure dangerous individuals were not hiding. The United States Supreme Court extended *Terry* and *Long* to allow this protective visual sweep of the defendant's residence after the defendant's arrest. *Maryland v. Buie* (1990), 494 U.S. at 333. The court noted the officer's interest in ensuring the house was not harboring dangerous individuals who could unexpectedly ambush them and held that officers need merely a

reasonable suspicion that the area may harbor a dangerous individual. Id. at 334, 337.

¶{41} Courts have permitted this protective sweep even where there is not an arrest when the police lawfully entered the residence. See, e.g., *State v. Shaffer*, 8th Dist. No. 93948 2010-Ohio-1744, ¶18-19, 21 (police lawfully entered to effect an arrest, but the intended target was not there); *State v. Sutton*, 7th Dist. No. 01-CA-181, 2002-Ohio-6901, ¶19 (officers entered apartment to ask questions with consent and then developed reasonable suspicion dangerous individuals might be hiding). See, also, *U.S. v. Oguns* (C.A.2, 1990), 921 F.2d 442, 446 (extending *Buie's* in-home arrest protective sweep doctrine to allow a protective sweep of a home even where the arrest occurs outside). Either way, the officers reasonably moved to the bedroom to investigate the source of the noise in order to ensure their safety.

¶{42} We next move to appellant's argument that the seizure and search of his jacket within his residence was unconstitutional. The search incident to arrest exception allows officers to conduct a search of an arrestee's person and the area within the arrestee's immediate control. *State v. Smith*, 124 Ohio St.3d 163, 2009-Ohio-6426, ¶11, citing *Chimel v. California* (1969), 395 U.S. 752, 762-763. The purpose of the search is to ensure officer safety and to preserve evidence. Id, citing *Arizona v. Gant* (2009), 556 U.S. 963.

¶{43} The area within an arrestee's immediate control means the area from within which he might gain possession of a weapon or destructible evidence or the area he might reach. *Chimel*, 395 U.S. at 763, 766. Although police cannot routinely search other rooms in a house after an arrest, police can, for instance, open a drawer located in front of an arrestee. Id.

¶{44} The reasonableness of a search incident to an arrest requires consideration of the totality of the facts and circumstances of each case. Id. at 765. However, the officer need not show that he had a specific fear in order to conduct a full custodial search. *Robinson v. United States* (1973), 414 U.S. 218, 235-236; *State v. Matthews* (1976), 46 Ohio St.2d 72, 74-75.

¶{45} This district has pointed out that the fact that an arrestee has been handcuffed does not terminate the applicability of the search incident to arrest exception. *State v. Schwab*, 7th Dist. No. 08MA78, 2009-Ohio-1312, ¶9, 21, citing

*United States v. Romero* (C.A. 6 2006), 452 F.3d 610, 619-620 (as a search incident to arrest, officers could lawfully search a nightstand a couple feet from the defendant when he was arrested, despite the fact that he was restrained prior to the search). Other districts have held likewise. *State v. White*, 10th Dist. No. 01AP-246, 2007-Ohio-7143, ¶15-17 (officer can search refrigerator incident to arrest even after arrestee was handcuffed); *State v. Johnson*, 8th Dist. No. 82697, 2003-Ohio-6641, ¶11 (fact that defendant was handcuffed does not necessarily mean that he was incapable of using a weapon or other item to harm the deputies or that the area was otherwise safe); *State v. Henderson*, 12th Dist. No. CA2002-08-075, 2003-Ohio-1617, ¶14-16 (search of a shaving kit a "few feet away" from the defendant at the time of his arrest was constitutional, even though the defendant was handcuffed and lying on the floor when the search occurred). See, also, *State v. Murrell* (2002), 92 Ohio St.3d 492, 493-496 (applying the search incident to arrest exception to search passenger compartment of vehicle even where arrestee was secured in back of car in handcuffs), adopting *New York v. Belton* (1981), 453 U.S. 454, 460 (area in "immediate control" for search incident to arrest exception includes a jacket in the passenger compartment of a car.)

¶{46} Thus, that Horace Landers was handcuffed prior to the seizure and search of the coat did not contaminate the search incident to his arrest. Moreover, the fact that the jacket did not end up belonging to the arrestee does not invalidate the search as the test is merely whether the object searched was within the area within the arrestee's immediate control. See *Chimel*, 395 U.S. at 766. Under the totality of the facts and circumstances here, the search of the jacket incident to the arrest of Horace Landers was reasonable. See id.

¶{47} More specifically, the officers had just begun a murder investigation as they discovered the body of a nineteen-year-old college student floating in the river with ligature marks on her neck and wrists. Soon after securing the body, they proceeded to the murder victim's apartment and were invited to enter the neighbor's apartment to make a call. This neighbor was a suspect in two attempted burglaries of the victim's apartment while she slept just days before. They asked him standard questions about the victim and whether he or anyone else in the apartment noticed anything suspicious. Appellant indicated that the apartment was empty but for himself.

The officers then heard a crash like a door hitting a wall. Appellant cryptically mumbled that he never told them that "he wasn't here." The officer's then found a shirtless man with a warrant out for his arrest hiding in a bedroom. When asked, the arrestee indicated that his shirt was lying on the bed. It was winter in Youngstown, Ohio. The wanted man was three to four feet from a jacket lying on the floor just outside the open bedroom door.

¶{48} This was not a "routine" search of rooms other than that where the arrestee was found. See id. This was the winter-time seizure of a jacket lying three to four feet from the shirtless arrestee and said to be within his lunge area. Testimony established that the coat was within the arrestee's lunge area. The trial court could thus reasonably conclude that the jacket was within the arrestee's immediate control at the time of his arrest. See *State v. Goss*, 8th Dist. N. 91160, 2009-Ohio-1074, ¶3, 15 (jacket hanging "a few feet away" from defendant in store where he worked found to be in his immediate control); *Romero*, 452 F.3d at 619-620 (nightstand "a couple of feet" from the arrestee); *Henderson*, 11th Dist. No. CA2002-08-075 at ¶14 (shaving kit a "few feet away" from arrestee); *State v. Miller* (Dec. 1, 1983), 8th Dist. No. 46695 (jacket on chair three feet from arrestee).

¶{49} That is, the jacket was within the arrestee's immediate control as the arrest commenced, the arrestee still had access to it thereafter, and the search was done promptly after the handcuffs were placed on the arrestee. See *Schwab*, 7th Dist. No. 08MA78 at ¶9, 21; *State v. Burnette* (July 10, 1996), 1st Dist. No. C-950887 (police could search jacket lying on floor "near" arrestee); *State v. Conklin* (Mar. 27, 1995), Butler App. No. CA94-03-064 (police can search jacket hanging near arrestee that matched his pants). As such, the jacket was properly searched incident to the arrest of Horace Landers.[3]

ASSIGNMENT OF ERROR NUMBER ELEVEN

¶{50} Appellant' eleventh assignment of error states:

¶{51} "APPELLANT'S PRIVILEGE AGAINST SELF-INCRIMINATION AND RIGHT TO COUNSEL WERE VIOLATED WHEN THE TRIAL COURT OVERRULED APPELLANT'S MOTION TO SUPPRESS EVIDENCE AND ADMITTED

---

[3]Thus, appellant's other argument (that police cannot decide to pick up articles of clothing in a residence without prompting by the arrestee and search them under the guise that they want the arrestee to be warm) is irrelevant. See prior footnote as well.

STATEMENTS TAKEN IN VIOLATION OF *MIRANDA V. ARIZONA* AND *EDWARDS V. ARIZONA* [CITATIONS OMITTED]."

¶{52} Appellant unsuccessfully sought to suppress two statements he made to his probation officer. At the suppression hearing, a detective testified that he witnessed appellant signing a rights waiver sheet on December 30, 1985 and on December 31, 1985 while in jail. The detective was able to produce the signed waiver sheets at the suppression hearing. (Tr. 26, 28). Appellant made no statements to the detective, and he did not request an attorney. (Tr. 25-27, 29, 46-47).

¶{53} On December 30, 1985, appellant's probation officer visited him in jail to tell him that he was placing a hold on him. The probation officer testified that appellant signed a rights waiver. (Tr. 72). His notes memorialized that appellant signed this waiver and made a voluntary statement. He explained that he could not locate the signed waiver due to the routine destruction of older files. (Tr. 73, 79). Appellant's statement was not incriminating but merely recounted that he was arrested.

¶{54} On January 2, 1986, the probation officer visited appellant again and told him that he was still under the waiver of rights previously signed. (Tr. 84-85). His notes verify this testimony. Appellant explained that he found the victim's ATM card on the front porch steps at 11:30 a.m. on December 30, 1985 and he put it in his pocket when she did not answer her door. As the jury could find that this statement was a lie because witnesses testified that appellant used the ATM card the previous night, this statement is somewhat prejudicial.

¶{55} It is well-established that the state may not use statements obtained during a custodial interrogation of a defendant unless the police have used procedural safeguards to secure the defendant's Fifth Amendment right against self-incrimination. *Miranda v. Arizona* (1966), 384 U.S. 436, 444. To preserve this right, the defendant must be advised of his right to remain silent and to have legal counsel present at interrogation. Id. at 467-470.

¶{56} Initially, appellant cites law holding that if the suspect expresses a desire to speak only through counsel, there can be no further interrogation unless the defendant initiates conversation. See *Edwards v. Arizona* (1981), 451 U.S. 477, 484. He also states that the mere failure to request an attorney is not a waiver of the right to have an attorney present.

¶{57} However, these statements are inapplicable and incorrect respectively. Appellant's citation to *Edwards* is irrelevant as appellant did not specifically express a desire to speak only through counsel. Moreover, a suspect must invoke his right to counsel unambiguously. *Davis v. United States* (1994), 512 U.S. 452, 459. If he does not do so at all or does so only ambiguously, then he has not invoked his right. Id. As there is no indication at all that appellant referenced counsel after being advised of his rights, this argument is without merit.

¶{58} Appellant next argues that he invoked the right to remain silent by not providing a statement to the detective. He concludes that if he invoked his right to remain silent to the detective, then the probation officer was not permitted to seek a statement from him. Appellant then states that where a defendant does not speak, there can be no further interviews, citing *Maryland v. Shatzer* (2010), 130 S.Ct. 1213, 1219.

¶{59} Although *Shatzer* noted the law that interrogation must cease if a suspect indicates he wishes to invoke his right to remain silent, this is not the main point in *Shatzer*. Id., citing *Miranda*, 384 U.S. at 473-474. Rather, *Shatzer* dealt with a defendant who expressly invoked his right to counsel, not one who merely declined to speak. Moreover, the United States Supreme Court has even more recently held that a defendant does not invoke the right to remain silent by merely remaining silent. *Berghuis v. Thompkins* (2010), 130 S.Ct. 2250, 2260. Rather, the defendant must unambiguously express that he does not want to make a statement. Id. Otherwise, the police can continue questioning the defendant.

¶{60} Even prior to this, the Supreme Court had held that a defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, can support a conclusion that a defendant has waived his rights. *North Carolina v. Butler* (1979), 441 U.S. 373, 376. Courts were instructed to look at the particular facts and circumstances of each case, including the background, experience, and conduct of the defendant. Id. at 375.

¶{61} Furthermore, a suspect who receives adequate *Miranda* warnings prior to a custodial interrogation need not be warned again before each subsequent interrogation. *State v. Treesh*, 90 Ohio St.3d 460, 470 (upholding partial *Miranda* warnings after full *Miranda* at time of arrest), citing *State v. Barnes* (1986), 25 Ohio

St.3d 203, 208 (incriminating statement made 24 hours after *Miranda*), *State v. Brewer* (1990), 48 Ohio St.3d 50 (*Mirandizing* by one police department in one day is sufficient to uphold incriminating statements made to another police department the next day even though defendant was not *re-Mirandized*). The court is to view the totality of the circumstances to determine whether prior *Mirandizing* remains valid for a subsequent interview. *Treesh*, 90 Ohio St.3d at 470, citing *State v. Roberts* (1987), 32 Ohio St.3d 225, 232.

¶{62} Here, the only evidence we have is that appellant originally refused to make a statement. This does not unambiguously show that he expressed that he was invoking his right to remain silent. *Berghuis*, 130 S.Ct. at 2260. Under the aforementioned case law, the fact that he did not make a statement when the detective asked him to on December 30[4] is not absolutely dispositive. It is part of the totality of the circumstances to be considered by the trial court.

¶{63} As the state points out, after a defendant fails to make a statement and questioning ceases, the defendant can be approached thereafter. See *Michigan v. Mosley* (1975), 423 U.S. 96, 104. Plus, appellant's other conduct can reasonably be seen as indicating waiver of his right to silence. Most notably, on the day of his arrest, he voluntarily spoke to his probation officer about the general sequence of arrest events. Three days later (and two days after he signed another waiver sheet), he then provided more explanation to his probation officer when asked about specific evidence.

¶{64} Along these lines, the failure to physically produce a rights waiver sheet signed for a probation officer more than twenty years prior would not require the suppression of a statement. In fact, even a refusal to sign a physical paper waiving rights does not equate with the lack of an actual waiver of rights. See *State v. Scott* (1980), 61 Ohio St.3d 155, 161. Rather, the waiver sheet is just one piece of evidence that can be used to show a valid waiver. See *State v. Shakoor*, 7th Dist. No 01CA121, 2003-Ohio-5140, ¶19. Thus, a lost rights waiver sheet is not dispositive.

¶{65} The probation officer testified that appellant was reminded of his prior waiver of rights and advised that the waiver was still in effect. As he had previously

---

[4]As for the detective's December 31 visit, we note that this visit was made to obtain blood under a search warrant. This rights waiver form was presented just in case the defendant made a statement during the procedure. (Tr. 29, 51).

waived his rights to this officer, the reminder is an important feature of this case. See, e.g., *State v. Anderson*, 11th Dist. No. 2009-T-0041, 2010-Ohio-2291, ¶31 (defendant asked generally if he reaffirmed his rights), citing *State v. Parrish*, 2d Dist. No. 21091, 2006-Ohio-267; *State v. Green* (Jan. 15, 1993), 3d Dist. No. 2-92-6 (reminded of rights waiver from day before). Contrary to appellant's assertion, the probation officer's testimony, refreshed by his notes, was believable. The trial court could rationally conclude that appellant signed a form for this officer on December 30, 1985 and that he was advised on January 2, 1986 that he was still under the rights waiver.

**¶{66}** Moreover, whether appellant understood his rights was a factual matter best left to the trial court, whose decision is supported by the facts. See, e.g., *State v. Mills* (1992), 62 Ohio St .3d 357, 366. For instance, appellant was in his late-twenties. The probation officer testified that he knew appellant could read and write. (Tr. 71). The fact that appellant signed three rights waiver forms in two days is a fact tending to show that his statement was voluntarily made two days after the last waiver where he was reminded of his prior waiver. Moreover, appellant had numerous prior experiences with the criminal justice system, including both arrests and convictions. Thus, contrary to appellant's claim, there is no indication that appellant's will was overborne by having his probation officer visit him twice after a detective briefly questioned him once and drew blood once. For all of these reasons, this assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER FIVE

**¶{67}** Appellant's fifth assignment of error contends:

**¶{68}** "APPELLANT WAS DENIED RIGHTS AND LIBERTIES PROTECTED BY [THE CONSTITUTION] [CITATIONS OMITTED] WHEN THE TRIAL COURT OVERRULED APPELLANT'S MOTION FOR DISCHARGE."

**¶{69}** On June 13, 2008, appellant filed a motion for discharge due to pre-indictment delay. He pointed out that the crime was committed on December 29, 1985, he was considered a suspect and arrested for receiving the victim's stolen property the next day, but he was not indicted until October 11, 2007, which is nearly twenty-two years after the crime. After the July 17, 2008 hearing, the trial court denied appellant's motion, finding no evidence of actual prejudice. The court heard the following timeline evidence from an investigating detective.

¶{70} Just before appellant's arrest, police found the victim's ATM card in appellant's jacket (along with his own welfare card). Just after his arrest, police found the victim's television in appellant's apartment. They found the victim's key chain containing the keys to her apartment and her car in appellant's bathroom wastebasket. They also found the victim's potholder in appellant's kitchen trash.

¶{71} In early January of 1986, police received bank records showing that the victim's ATM card had been used multiple times at a certain location around 9:30 p.m. on December 29, 1985. Police contacted other ATM users. Soon thereafter, a couple identified appellant as the person using the ATM at the same time they were at the bank, and the man identified the victim's vehicle as the car appellant was driving. On January 29, 1986, fingerprints on the television were matched to those of appellant.

¶{72} The victim's friends were questioned. She was last seen around 4:30 p.m. on December 29, 1985. She had expressed fear of appellant to the friend who saw her last and to her parents. (Hrg. Tr. 147). Appellant had previously given her a card that disturbed her, and he often asked to be invited to her apartment.

¶{73} Horace Landers gave two statements that incriminated the defendant regarding the television and the keys and that placed appellant wiping the stairs up to the victim's apartment with a potholder. (Hrg. Tr. 143, 169). On February 5, 1986, forensic analysis reported that red pubic and head hair consistent with the victim's was found on the potholder along with "Negroid" hairs. (Hrg. Tr. 159).

¶{74} Blood analysis returned on that same day concluded that the donor to the semen found on the victim was a Type B non-secretor, that appellant was also a Type B non-secretor, and that this combination was consistent with 4% of the black population. (Hrg. Tr. 159). The analysis excluded Horace Landers and the victim's boyfriend as the donors. The parties stipulated that a BCI employee would have testified that the state had a "great case" at the time "scientifically speaking." (Hrg. Tr. 218).

¶{75} The case against appellant for receiving stolen property was presented to the grand jury on February 21, 1986, and a no bill was returned on May 2, 1986. Appellant's girlfriend, Adena Fedelia, testified before the grand jury. She had been providing seemingly deceptive statements to the police concerning whether the victim's vehicle was at the apartment on the night of the murder.

**¶{76}** In 1989, with the advent of new DNA technology, the state submitted the forensic evidence to an out-of-state laboratory. However, the technology was new, and the state's evidence got weaker as the results showed that the DNA recovered from the semen was consistent with appellant's DNA and with 12% of the black population. (Hrg. Tr. 160-161, 173).

**¶{77}** Thereafter, STR DNA technology was on the rise. The parties have stipulated to the following. In 1995, some states were using STR DNA, but Ohio was not. In 1997, a scientist at Ohio's BCI began over two years of training in order to perform STR DNA testing. In late 1999, BCI issued its first results using this technology. In 2000, BCI got accredited to enter CODIS. In 2002, BCI started accepting more requests after the opening of a new facility. In 2004, the federal government started providing grants to BCI to run cold cases. (Hrg. Tr. 216-218).

**¶{78}** Testimony showed that when a new chief of police took office in 2006, cold cases were reviewed to see which ones could be retested. (Hrg. Tr. 162). In 2007, a new attorney general invited local police departments to send in DNA from cold cases to BCI for forensic testing. (Hrg. Tr. 164). The evidence in this case was submitted to BCI in mid-2007. In September, BCI reported that they could extract DNA from the vaginal and underwear swabs. However, new samples were needed from appellant.

**¶{79}** In order to receive his blood, a decision was made to arrest appellant and hope the DNA results matched. (Hrg. Tr. 165-166). He was arrested on October 4, 2007, and his blood was obtained pursuant to a search warrant. On October 11, 2007, the results came back showing that appellant was the donor of the semen, and he was indicted for the murder that same day. (Hrg. Tr. 167).

**¶{80}** At the hearing on the motion for discharge, appellant called a private detective to the stand. He stated that he was trying to find the victim's former roommates (prior to her taking up residence on Ohio Avenue). (Hrg. Tr. 121-122). He also stated that one hour before the hearing, the defense had provided him with four names (two of them only nicknames) representing witnesses who may be able to provide an alibi that appellant was at a party on December 29, 1985. (Hrg. Tr. 120). The investigator testified that it would have been much easier to find these witnesses and to determine nicknames twenty-two years ago. (Hrg. Tr. 121).

**¶{81}** With this background, we now turn to the law on the subject of pre-indictment delay. A defendant's due process rights can be violated by pre-indictment delay under certain circumstances. *United States v. Marion* (1971), 404 U.S. 307, 324. The defendant has the initial burden to show that he was substantially and actually prejudiced due to the delay. *State v. Whiting* (1998), 84 Ohio St.3d 215, 217. If he can do so, the burden shifts to the state to produce evidence of a justifiable reason for the delay. Id. Thereafter, the due process inquiry weighs the reasons for the delay against the prejudice to the defendant. *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, ¶51, citing *United States v. Lovasco* (1977), 431 U.S. 783, 790.

**¶{82}** The determination of actual or substantial prejudice entails "a delicate judgment based on the circumstances of each case." *Walls*, 96 Ohio St.3d 437 at ¶52, quoting *Marion*, 404 U.S. at 325. The court must consider the evidence against the defendant as it exists at the time the indictment is filed to ascertain whether the delay actually prejudiced his trial. *Walls*, 96 Ohio St.3d 437 at ¶52; *State v. Luck* (1984), 15 Ohio St.3d 150, 154; *Marion*, 404 U.S. at 326. In demonstrating sufficient prejudice, the defendant must set forth examples of issues arising from the delay that could be considered more than merely "somewhat prejudicial." *Walls*, 96 Ohio St.3d 437 at ¶56, citing *Lovasco*, 431 U.S. at 796.

**¶{83}** In addition, the prejudice must not be merely speculative. *Walls*, 96 Ohio St.3d 437 at ¶56. The defendant cannot rely solely on the possibility of prejudice that is inherent in any extended delay that memories will dim, witnesses will become inaccessible, and evidence will be lost. *Marion*, 404 U.S. at 326. Thus, the mere fact that someone the defendant may have wished to call as a witness died during the delay does not establish prejudice. See, e.g., *State v. Harris*, 7th Dist. No. 08JE39, 2009-Ohio-6804, ¶27-28 (victim's aunt and victim's best friend both died during delay but any benefit to the defendant from their presence was mere speculation); *State v. Christman* (May 2, 1999), 7th Dist. No. 786 (mere fact that appellant's mother died during eleven-year delay is not prejudicial).

**¶{84}** In other words, speculation on the potential content of lost testimony is insufficient. *Christman*, 7th Dist. No. 786, citing *United States v. Doerr* (C.A.7, 1989), 886 F.2d 944, 964 (defendant must show exculpatory value of the lost testimony). Thus, in *Luck*, where the state presented a "confession" of the defendant stating that

the victim attacked the defendant and was killed in the ensuing fight and where the defendant also stated that a now-deceased witness could confirm this version of events, actual prejudice was sufficiently established. *Luck*, 15 Ohio St.3d at 157-158.

¶{85} As for the reason for the delay, delay can be unjustifiable when the state intentionally tried to gain a tactical advantage over the defendant. Id. at 158. It can also be unjustifiable when the state, through negligence or error in judgment, effectively ceases the active investigation of the case but later decides to commence prosecution *on the same evidence* available at the time the active investigation ceased. Id. at 158 (length of the delay is a key factor in determining whether a delay caused by negligence or error in judgment is justifiable). The United States Supreme Court has stated that investigative delay is fundamentally unlike delay undertaken solely to gain tactical advantage over the defendant. *Lovasco*, 431 U.S. at 795. Both high courts have stated that the prosecution is not required to commence a prosecution merely because there is sufficient evidence to prove guilt beyond a reasonable doubt. *Luck*, 15 Ohio St.3d at 158, citing *Lovasco*, 431 U.S. at 792.

¶{86} In *Luck*, the Ohio Supreme Court found that fifteen years of pre-indictment delay was unjustifiable because the prosecution commenced its case without one shred of new evidence. Id. at 158-159. Later, in *Walls*, the Ohio Supreme Court found that thirteen years of pre-indictment delay was justifiable because the indictment occurred just months after new computer technology made it possible to match fingerprints from the scene to those of the defendant and because the state proceeded diligently after receiving the new evidence. *Walls*, 96 Ohio St.3d 437 at ¶56.

¶{87} We begin with appellant's allegations of prejudice. First, he points to a deceased witness: Horace Landers was murdered in May of 1988. (Tr. 144). He states that Landers was important because he was arrested in appellant's apartment at the same time as appellant and because Mrs. Allie initially picked him out of a line-up as being at the ATM. However, Landers was arrested due to an outstanding warrant, and Mrs. Allie recanted, explaining that she chose someone who was the opposite of the person she saw at the ATM because she was frightened to make a public identification. Moreover, to establish a claim of prejudice due to the unavailability of a witness, the defendant must identify the subject matter of that

witness's testimony and must explain how the missing evidence impaired his defense. See, e.g., *State v. Harris*, 7th Dist. No. 08JE39, 2009-Ohio-6804, ¶27-28; *State v. Robinson*, 6th Dist. No. L-06-1182, 2008-Ohio-3498, ¶126; *State v. McClutchen*, 8th Dist. No. 81821, 2003-Ohio-4802, ¶13; *State v. Christman* (May 2, 1999), 7th Dist. No. 786. Appellant has failed to do this here.

¶{88} In fact, the statement provided by Landers *incriminated* appellant. Landers stated that in November, appellant had disclosed that he stole keys out of the upstairs neighbor's purse. Appellant had told him that he was going to break into the upstairs neighbor's apartment with her keys to steal her belongings and that he would lock the door behind himself. On the day after the murder, he saw appellant wiping down the stairs to the victim's apartment with a potholder that was later found to contain red pubic and head hair consistent with the victim and "Negroid" pubic and head hair. Landers also stated that when the police arrived, appellant asked him to throw away the keys and hide the television. The death of Landers served to exclude his incriminating statements from evidence, a great benefit to appellant. Moreover, it was appellant's DNA that matched the semen found on the victim, whereas Landers had been excluded as a donor soon after the murder.

¶{89} Appellant next complains that certain documents were lost. The first document affected his motion to suppress statements. Appellant made two statements to his probation officer. There was nothing incriminating about the first statement provided. In a second statement, appellant explained that he found the victim's ATM on the front porch step at 11:30 a.m. on December 30, 1985 and that he put it in his pocket because she did not answer her door. As this statement contradicts testimony that he used the victim's ATM the night before and contradicts with appellant's girlfriend's statement that he broke into the victim's apartment the morning after the murder, it can be seen as unfavorable to his defense. Appellant believes that his probation officer's inability to locate the *Miranda* rights waiver sheet (signed by appellant when he visited him in jail on December 30, 1985) was due to the passage of time and was prejudicial to his suppression motion.

¶{90} However, the probation officer testified that appellant signed a *Miranda* waiver prior to making his statement. (Tr. 72). The probation officer's past notes from the December 30, 1985 visit confirm that appellant signed a waiver of his rights and

made a voluntary statement.  His notes from the January 2, 1986 visit disclose that he reminded appellant of the rights waiver that he previously signed.

¶{91} As aforementioned, whether appellant read and understood his rights was a matter of credibility for the trial court at the suppression hearing.  That he waived his right to remain silent was evident by the fact that he made a statement to his probation officer.  It is also notable that the *Miranda* rights waiver sheets that appellant signed when questioned by police officers on December 30 and 31, 1985 were located by the police department.  Finally, appellant did not claim that he refused to sign the sheet.  Actual prejudice is not apparent.

¶{92} Another item appellant desired was the 1986 grand jury transcript from his receiving stolen property charge.  A detective's note indicates that a court reporter was present at the February 21, 1986 grand jury proceeding.  (Hrg. Tr. 157).  A court reporter testified at the July 7, 2007 hearing that she could not locate grand jury transcripts or her stenographic notes for that prior case.  (Hrg. Tr. 203-204).  Appellant claims the he is prejudiced by not knowing what charges were submitted to the grand jury or who testified.

¶{93} However, it was established that appellant was arrested and arraigned for receiving stolen property and bound over to the grand jury.  (Tr. 66).  Due to this fact and the fact that the case ended in a no bill, the relevance of the exact charges submitted is not clear.   In any event, the detective specifically testified that the receiving stolen property charge was no billed.  (Tr. 157).  Moreover, the detective's notes and testimony indicate that the probation officer, the victim's former boyfriend, and appellant's girlfriend were subpoenaed to testify before the grand jury.  (Tr. 157). It is extremely unlikely that the testimony from the probation officer or the victim's former boyfriend could have benefited appellant's defense.  His suggestions on this topic are pure speculation.

¶{94} As for the grand jury testimony of appellant's girlfriend, appellate counsel apparently did not notice that the state discovered on microfilm the girlfriend's grand jury testimony.  The testimony was filed as an exhibit to a motion on July 22, 2008. Her testimony constituted a mere three pages.  She stated that she lived with appellant on Ohio Avenue.  She disclosed that she spoke to appellant on January 1, 1986 about the victim's ATM card.  He told her that Horace Landers broke into the victim's apartment,

probably by using a butter knife and that Horace hid the ATM card in appellant's jacket pocket. As her testimony was preserved and provided below, the argument concerning the lack of her grand jury testimony is without merit.

¶{95} Appellant then complains that the police were unable to find the results of a polygraph test administered to his girlfriend. The detective testified that they did not receive written reports from the examiner back then but were orally told the examiner's opinion, which the detective would then memorialize in his notes. (Tr. 146). The detective presumed that the department's polygraph examiner kept a technical print-out of the graphs produced in his records, but noted that they could not find the internal polygraph record from back then. (Tr. 151, 186-187).

¶{96} The detective's testimony and notes disclose that the girlfriend was deceptive regarding the victim's vehicle. (Tr. 148-149). His testimony explained that the issue was whether the victim's car was at the apartment when the girlfriend returned home. (Tr. 149). Other notes show that the girlfriend seemed to be attempting to protect and defend appellant. Appellant does not explain how the graphical print-out of his girlfriend's polygraph from 1986 would help his defense. As the state points out, polygraph results are inadmissible in the absence of stipulation, and there is no stipulation in this case. As such, there is no showing of prejudice.

¶{97} Next, appellant states that memories have faded. He first points to Detective Landers, who testified at a suppression hearing. Appellant states that this detective could not recall anything specific about his attempted interviews with appellant on December 30 or 31, 1985 and that he could not remember if he testified before the 1986 grand jury. Since appellant did not speak during either attempted interview, the existence of prejudice concerning these attempts is not apparent. Although the detective could not recall whether he testified before the 1986 grand jury, appellant does not state how the answer to this would have assisted his defense.

¶{98} Appellant then points to the testimony of the victim's mother, stating that she could not remember the victim's date of birth or where she went to college but could remember that the victim expressed fear of appellant. (Tr. 71). However, substantial prejudice is not apparent by the mother's inability to remember a birth date or a college name. Whether she could actually remember that the victim expressed fear of appellant is a pure credibility issue.

¶{99} Appellant then complains that he cannot remember the names of the witnesses who could have placed him at a party on December 29, 1985. However, the trial court was advised that the defense provided to its private investigator the full names of two potential alibi witnesses and the nicknames of two other potential alibi witnesses. Notably, these names were not provided to the investigator until an hour before the pre-indictment delay hearing, when the murder indictment had been pending for nine months. Whether these witnesses could be tracked was not known at the time of the hearing. There is also no indication that appellant ever knew the real names of two other acquaintances for whom he only provided nicknames. As the state pointed out, there was no indication that appellant consulted with his prior attorney who may have taken notes regarding a potential alibi since he was considered a suspect for the murder at the time of his receiving stolen property arrest. Finally, there is no indication that these witnesses would have testified that appellant was at the party during all relevant hours. In fact, one alibi witness listed by appellant as being at a party the night of the murder refuted appellant's claim that she saw him that night.

¶{100} Appellant concludes by arguing that the delay provided the state with a tactical advantage. The tactical advantage spoken of by the Supreme Court deals with intentionally delaying in order to gain a tactical advantage, not with the state delaying for some other reason and ending up receiving a tactical advantage. In any event, we proceed to address his final two concerns. First, he states that if he had been indicted and tried in 1986, then his convictions for rape, kidnapping, and aggravated robbery in another criminal case, 1986CR43, would not have existed. However, it is pure speculation that the Tenney murder case would have proceeded to trial before the Boardman rape case, a crime which took place prior to the murder of Gina Tenney. In fact, the trial court *precluded the state* from using the Boardman rape case as other acts evidence, and the defense raised the issue in the sentencing phase to show his rehabilitation while in prison on that offense.

¶{101} Lastly, appellant points out that the law on circumstantial evidence changed to his detriment during the delay. The prior law was that "circumstantial evidence relied upon to prove an essential element of a crime must be irreconcilable with any reasonable theory of an accused's innocence in order to support a finding of

guilt." *State v. Kulig* (1974), 37 Ohio St.2d 157. This premise was overruled in 1991 when the Court stated that circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof. *State v. Jenks* (1991), 61 Ohio St.3d 259, 274 (the state need only prove its theory of the case beyond a reasonable doubt and no longer must disprove any reasonable theories of innocence offered by the defense).

¶{102} However, the Supreme Court has ruled that application of the *Jenks* ruling to offenses committed prior thereto does not violate the constitutional prohibition against ex post facto laws. *State v. Webb* (1994), 70 Ohio St.3d 325, 331. The Court noted in part that the new rule does not deprive one charged with a crime of a defense available according to law at the time when the act was committed. Id. The Court even stated that a case containing a judicially-created rule regarding the proof required at trial that overrules a prior case is essentially a holding that the prior case "never was the law." Id. As such, this change in the law is not the prejudice envisioned by the pre-indictment delay test. See *Christman*, 7th Dist. No. 786 (disposing of a similar argument).

¶{103} In reviewing the allegations of prejudice contained in appellant's brief, there does not appear to be actual or substantial prejudice to his defense. This is especially true considering the quantum of evidence presented against him at trial. He had the victim's ATM card in his pocket. He used the ATM card multiple times on December 29, 1985, hours after the victim was last seen. He drove her vehicle to the ATM machine. The keys to her car and apartment were found in a wastebasket in the apartment he stayed in with his girlfriend. The victim's television was found in the apartment with appellant's fingerprints on it. A potholder matching one found in the victim's apartment was found in appellant's apartment, and this item contained red pubic and head hair consistent with that of the victim and "Negroid" hair. The victim had ligature marks on her wrists and neck and her body was found in the Mahoning River. Appellant's DNA matched the semen found on the vaginal and underwear swabs of the victim. It was established that the victim would not willingly have had intercourse with appellant.

¶{104} Finally, there appears to be a justifiable reason for the delay. First, there is no allegation or indication that the delay was intentionally implemented by the

state in order to gain a tactical advantage over the defendant. See *Luck*, 15 Ohio St.3d at 158. Second, there is no indication of negligence or error in judgment which caused the state to cease its active investigation and fail to seek an indictment prior to closing the case. See id. Third, the 2007 murder indictment was not commenced upon the same evidence available to the state at the time the active investigation ceased in 1986 (and again in 1989 when new DNA evidence negatively affected the state's case). See id.

¶{105} As to the second point, if the state could not get an indictment for receiving the victim's stolen property, then the prosecutor's use of discretion to forgo a murder indictment appears reasonable. This was a case of good faith investigative delay. See *Lovasco*, 431 U.S. at syllabus. A prosecutor has no duty to indict a suspect for murder merely because there is probable cause to arrest the suspect for murder. See id. at 791. A court cannot abort a criminal prosecution merely because it disagrees with a prosecutor's judgment as to whether to seek an indictment prior to the close of the active investigation. Id. at 790 (the determination of whether to indict early is seldom clear-cut, and reasonable people will often reach different conclusions).

¶{106} The closing of the case was not through negligence or error in judgment with a subsequent realization of a mistake resulting in an indictment based upon substantially the same evidence. See *Christman*, 7th Dist. No. 786. Just prior to the indictment, the state received the results of STR DNA that essentially conclusively established that appellant was the source of the semen elicited from the rape kit. This is a significant advance in identification.

¶{107} Back in 1986, the results of a blood serum analysis only showed that the semen was consistent with appellant and also with 4% of the black population. The 1989 DNA test provided the state with even less favorable scientific odds as it found the semen to be consistent with 12% of the black population.

¶{108} The parties' stipulations suggest that BCI could not have accommodated a request for the STR DNA testing until 2002 at the earliest. There is no indication that an indictment rendered closer to that time would have diminished any alleged prejudice. It is also noted that the attorney general specifically invited

local agencies to submit DNA from cold cases to the BCI in 2007, which prompted the action here.

¶{109} In any event, although the state could have run the results sooner than 2007, the test for pre-indictment delay deals with negligence or error in judgment in *ceasing the active investigation*, not with a failure to reopen a properly closed case every time a new scientific technology is invented. See *Luck*, 15 Ohio St.3d at 158 ("through negligence or error in judgment, effectively ceases the active investigation of a case, but later decides to commence prosecution upon the same evidence that was available to it at the time that its active investigation was ceased"). At the time the active investigation was ceased, the prosecutor had sound reason to believe he may not be able to sufficiently prove his case. And, at the time the indictment was handed down, the state had discovered a substantial piece of new evidence proving that appellant was the source of the semen.

¶{110} As aforementioned, substantial prejudice was not established, and even if it had been, appellant's due process rights were not violated upon viewing the allegations of prejudice in light of the reasons for the delay. See id. at 154 (view prejudice in light of reasons for delay). See, also, *Walls*, 96 Ohio St.3d 437 at ¶51. This is not a case that violates the "fundamental conceptions of justice which lie at the base of our civil and political institutions" or that offend a "community's sense of fair play and decency." *Lovasco*, 431 U.S. at 790. As such, this assignment of error is overruled.

<u>ASSIGNMENT OF ERROR NUMBER TWELVE</u>

¶{111} Appellant's twelfth assignment of error alleges:

¶{112} "THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR DISCHARGE BASED UPON SPEEDY TRIAL IN VIOLATON OF LIBERTIES SECURED [THE CONSTITUTION AND THE SPEEDY TRIAL ACT] [CITATIONS OMITTED]."

¶{113} Appellant presents both statutory and constitutional speedy trial arguments here regarding post-accusation delay. We note that this argument is treated differently in the law than the above argument dealing with allegations of due process violations due to pre-indictment delay. We begin by analyzing his claim that his statutory right to speedy trial was violated.

**¶{114}** Appellant was arrested and incarcerated for aggravated murder on October 4, 2007. Being a felony, his speedy trial time expired after two hundred seventy days, not including any periods of tolling. See R.C. 2945.71(C)(2). As appellant acknowledges, he filed motions tolling his speedy trial time on October 29, 2007. He then waived his right to a speedy trial on November 5, 2007.

**¶{115}** Appellant calculates that seventy-five days were added to the speedy trial clock, using triple time from the day after his October 3, 2007 arrest until the day before he filed his tolling motions. See R.C. 2945.71(E) (each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days). In order to argue that his speedy trial rights were violated, he attempts to tack onto the clock more than two hundred fifty actual days[5] that he spent in jail from his December 30, 1985 arrest for receiving stolen property until a judgment entry memorializing a prior no bill was filed on September 12, 1986. He urges that this tacking is permissible because his 2007 arrest was based upon the same evidence existing at the time of his 1985 receiving stolen property arrest.

**¶{116}** The state first claims that even if the time appellant was held on the receiving stolen property charge could be tacked onto the current case, two hundred seventy days had not expired by the time of his October 29, 2007 tolling motions in the current case. By appellant's calculations, he needs one hundred ninety-five days from the old case in order for his argument to work. He can only reach this number by using the September 12, 1986 date of the entry journalizing the prior no bill. However, the receiving stolen property charge was no billed on May 2, 1986. The state points out that although the entry was not journalized until September of 1986, this was prior to the running of the statute of limitations in that case. The state suggests that since the entry was filed prior to the running of the statute of limitations, it could permissibly relate back to the May 2, 1986 actual no bill occurrence. See *State v. Mincy* (1982), 2 Ohio St.3d 6, 8-9 (sua sponte continuances permissible to toll statute of limitations if journalized prior to expiration of statute of limitations period); *State v. Lee* (1976), 48 Ohio St.2d 208; *State v. Harris*, 5th Dist. No., 06-CA-40, 2006-Ohio-5999, ¶3, 18 (entry

---

[5]He concedes that there was no triple time after January 2, 1986, which is when he received notice of a probation violation and thus was not solely being held on the pending charge of receiving stolen property.

giving reasons for continuance relates back to date continuance was actually granted as long as it was journalized prior to the expiration of the statute of limitations).

¶{117} It is also notable that a no bill is a grand jury report, not a court decision, even if the court later journalizes it.  See *State v. Alexander*, 4th Dist. No. 08CA3221, 2009-Ohio-1401, ¶1-2 (no charge pending between no bill and later indictment even if court never made entry lifting bail conditions).  Along these lines, the state suggests that appellant was not being held on the receiving stolen property charge after the May of 1986 no bill.  In fact, it was established that he was being held on a probation violation in another case and on a separate multi-count indictment in yet another case. (July 17, 2008 Tr. 110).

¶{118} **In any event, we conclude that the time elapsed on the receiving stolen property case cannot be utilized by appellant to add to the time elapsed on the murder case.**  In support, we review some cases addressing this issue of tacking time elapsed from one charge to another.  In one case, the defendant was initially charged with having an unlawful concentration of alcohol on his breath while driving.  *State v. Adams* (1989), 43 Ohio St.3d 67, 68.  The state dismissed this charge.  Thereafter, the state filed a second complaint charging the defendant with operating a motor vehicle while under the influence of alcohol.  The Supreme Court noted that the same time period applied to both charges, holding:

¶{119} "When new and additional charges arise from the same facts as did the original charge and the state knew of such facts at the time of the initial indictment, the time within which trial is to begin on the additional charge is subject to the same statutory limitations period that is applied to the original charge."  Id.

¶{120} Thus, the time elapsed during the prosecution on one indictment will not be counted toward a subsequent indictment if either:  (1) the additional criminal charges arose from facts different than those relied upon for the original charge; or (2) the facts were the same but the state did not know of the facts at the time of the initial indictment.  The Court reiterated this holding in *Baker* and stated that subsequently indicted crimes that are based on different facts do not arise from the same sequence of events for the purposes of speedy-trial computation.  *State v. Baker* (1997), 78 Ohio St.3d 108, citing *Adams*, 43 Ohio St.3d 67, 68.  See, also, *State v. Parker*, 113 Ohio St.3d 207, 2007-Ohio-1524, ¶20 (*Baker* and *Adams* stand for the proposition that

"speedy-trial time is not tolled for the filing of later charges that arose from the facts of the criminal incident that led to the first charge"); *State v. Bonarrigo* (1980), 62 Ohio St.3d 7, 9-10 (speedy trial time elapsed on prior charge is added to the current prosecution if it is based upon the same conduct).

¶{121} The First District has applied these holdings in a similar situation. For instance, a defendant was indicted for burglary of a murder victim's apartment. Although his co-defendant (whose story changed several times) told police that the defendant killed the victim, the defendant insisted that she was already dead when he entered her residence. *State v. Burrell*, 1st Dist. No. C-0303803, 2005-Ohio-34, ¶11. Police later received information from a jail inmate that the defendant took credit for the murder and related information not previously released to the public. Id. at ¶12. The court concluded that the second indictment for murder and robbery was based on facts not available to the state at the time of the first indictment for burglary and thus the state was not subject to the speedy-trial timetable of the first indictment. Id. at ¶13.

¶{122} Although there was no indictment for the 1985 arrest here, an arrest where the defendant is held pending formal charges begins the speedy trial time for the initial offense just as would an arrest after an indictment. *State v. Azbell*, 112 Ohio St.3d 300, 2006-Ohio-6552 ¶21. Thus, appellant's arrest for receiving stolen property on December 30, 1985 is the focus date for determining what the charge was based upon, not the entire period of his incarceration as he seems to suggest by urging us to view the facts available in 1986 as well as those existing on the date of his arrest.

¶{123} Here, appellant was arrested on December 30, 1985 because he had a stolen ATM card in his jacket pocket. Shortly thereafter, the victim's television and key chain were found in appellant's apartment. Although the card belonged to a murder victim that had just been recovered from the river, this does not mean that a murder charge arises from the same facts as those supporting the receiving stolen property charge. For all the police knew at the time, appellant received the property from Mr. Landers, who was also a murder suspect, or appellant burglarized the victim's house when she failed to return home for the night.

¶{124} The facts known to police that night were not as extensive as the facts developed thereafter through investigation. It was not until February of 1986 that the police had forensic evidence excluding Mr. Landers and the victim's former boyfriend

as the semen donors and failing to exclude appellant as the source. It was also not until 2007 that police had state-of-the-art DNA evidence nearly conclusively establishing the appellant was the source of the semen.

¶{125} As such, the murder indictment did not arise from the same facts as the receiving stolen property arrest. Additionally and alternatively, the murder indictment arose from some new facts of which the state was unaware of at the time of the receiving stolen property arrest. Thus, the time elapsed from his 1985 arrest until he was no longer being held for receiving stolen property need not be added to the speedy trial clock that began in 2007 regarding the aggravated murder charge.

¶{126} As aforementioned, appellant also claims that his *constitutional* right to a speedy trial (as opposed to statutory addressed above) was violated by the post-accusation delay, again retreating back to his 1985 arrest for receiving stolen property. He cites *State v. Meeker* (1971), 26 Ohio St.2d 9 and *State v. Selvage* (1997), 80 Ohio St.3d 465 to support this claim.

¶{127} In *Meeker*, the defendant was charged with armed robbery in April of 1963 and pled to a lesser included offense of robbery thereafter. In 1969, he successfully sought vacation of his plea due to the lack of counsel. Upon re-presentment of the case to the grand jury, appellant was indicted for armed robbery, theft of a motor vehicle, cutting with intent to wound, and assault with intent to commit robbery. These offenses were all committed at the same time of the 1963 robbery and there was no indication that all of the defendant's actions were not fully known at the time of the 1963 charge. The Supreme Court addressed the issue of whether the three additional counts violated the defendant's speedy trial right. The Court concluded:

¶{128} "Where a defendant, at the same time and place in April 1963, commits acts which would constitute four separate crimes, and where the state with knowledge thereof elects in June 1963 to charge the defendant with but one of such crimes, those counts in an indictment returned in April 1969, charging the defendant with the other three crimes, are violative of the defendant's right to a speedy trial." *Meeker*, 26 Ohio St.2d at 17.

¶{129} In *Selvage*, police made two drug buys in March of 1994 and filed a criminal complaint in June of 1994, but did not serve the complaint in order to protect

an officer's identity. *State v. Selvage* (1997), 80 Ohio St.3d 465. The defendant was then indicted for the same drug sales in April of 1995. The Supreme Court emphasized that the defendant was the subject of official accusations for thirteen months. The Court found this delay violated the defendant's constitutional right to a speedy trial. Id. at 466, citing *Meeker*.

¶{130} The court in *Selvage* acknowledged that *Meeker* is limited by *Luck*, which is the case appellant discussed in his fifth assignment of error. Id. at fn.1. The *Selvage* Court then went on to find that its facts fit under *Meeker* because the defendant was the subject of an official prosecution unlike the *Luck* defendant. Id. If the facts do not fit under the *Meeker* test, then no further analysis is required. See id. (proceeding to analyze the situation under the *Barker v. Wingo* (1972), 407 U.S. 514 factors of length of delay, reasons for delay, prejudice, and assertion of the right).[6]

¶{131} The facts underlying the initial official prosecution are pertinent. In *Selvage*, both the known facts and the crimes were the same. The test set forth in *Meeker* is essentially resolved by our application of the *Adams/Baker* test earlier in this assignment where we determined that the statutory speedy trial time for the offense of receiving stolen property would not apply to the time period for the subsequent indictment. As analyzed supra, at the time of appellant's December 30, 1985 arrest, the state did not have knowledge of all the facts tending to show that appellant not only received stolen property belonging to the victim but also murdered her during a rape (and during an aggravated burglary and aggravated robbery).

¶{132} As such, appellant's arguments under *Meeker* and *Selvage* are without merit. Since the arrest for receiving stolen property was not based upon the same set of facts as the later indictment, appellant's speedy trial arguments set forth herein are overruled.

¶{133} Appellant also argues that the court's July 28, 2008 decision on speedy trial should be reversed because the essential findings were not placed in the entry as required by Crim.R 12, which states, "Where factual issues are involved in determining

---

[6]It should be noted that appellant relies on the time from 1985 until his 2007 waiver to support his constitutional speedy trial claim. However, even if we could reach the *Barker* analysis here, the delay between a dismissal of an original charge and a subsequent indictment is not counted in determining whether delay is too long for purposes of speedy trial rights. *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, ¶65 (addressing a constitutional speedy trial argument as well).

a motion, the court shall state its essential findings on the record." Crim.R. 12(F). That is, the court stated that it reviewed the docket from the 1985 case and this case and concluded that appellant's speedy trial rights were not violated. The court had set forth some facts, but these did not directly relate to the speedy trial portion of the motion but were more relevant to the statute of limitations and due process arguments.

¶{134} Appellant acknowledges that the trial court did not have a duty to state its essential findings of fact in support of its denial unless he requested findings. See *State v. Eley* (1996), 77 Ohio St.3d 174, 179 (defendant must invoke rule); *State v. Brown* (1992), 64 Ohio St.3d 467, 481 (where defendant did not ask for findings and record supports decision, reversal for failure to make findings of fact is improper); *City of Bryan v. Knapp* (1986), 21 Ohio St.3d 64, 65 (where defendant orally asked for findings of fact to be placed on the record at the hearing, trial court erred in stating that he was not entitled to findings as to why it was denying speedy trial motion). Appellant then states that he invoked this duty where his motion to dismiss asked the court to state its findings of fact if it denied his motion.

¶{135} Even if a trial court commits this error, however, there also must be prejudice in order to reverse. *State v. Sapp*, 105 Ohio St.3d 104, 2002-Ohio-7008, ¶96 (if record is sufficient to allow full review of motion, there is no prejudice in failure to state findings of fact under Crim.R. 12). See, also, *State v. Benner* (1988), 40 Ohio St.3d 301, 317-318. In addition, the failure to object to the lack of requested pretrial motion findings prior to or at trial constitutes waiver of the issue. *State v. Brewer* (1989), 48 Ohio St.3d 50, 60.

¶{136} Initially, we should note that although the court's entry does not contain factual findings, the court did note on the record at the hearing during the arguments on speedy trial that appellant was not charged with receiving stolen property in the pending case. (Hrg. Tr. 112-113). It should also be noted that a preemptive request for findings in a pretrial motion filed months before a hearing can easily be accidentally overlooked. And, appellant did not object to the court's entry at a time when the court could have corrected it. See *Brewer*, 48 Ohio St.3d at 60. Furthermore, there is no indication of prejudice in the lacking factual findings because the record is sufficient to allow our review of the issue. *Sapp*, 105 Ohio St.3d 104 at ¶96 (if record is sufficient to allow full review of motion, there is no prejudice in failure to state findings of fact

under Crim.R. 12). This is evidenced by our analysis of the speedy trial issues above. As such, this argument is without merit.

ASSIGNMENT OF ERROR NUMBER THIRTEEN

¶{137} Appellant's thirteenth assignment of error contends:

¶{138} "APPELLANT WAS DENIED DUE PROCESS [CITATIONS OMITTED] WHEN HE WAS PROSECUTED FOR CONDUCT BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS."

¶{139} Appellant was tried for aggravated murder for purposely causing the death of Ms. Tenney while committing, attempting to commit, or fleeing immediately after committing or attempting to commit an enumerated felony. See R.C. 2903.01(B). The enumerated felonies here were rape, aggravated burglary, aggravated robbery, and kidnapping. As this type of aggravated murder does not involve prior calculation and design but relies on other felonious criminal acts, it is often called aggravated "felony murder."

¶{140} As aforementioned, appellant was originally indicted for the above enumerated felonies as well as the aggravated murder. However, the trial court dismissed these counts based upon the fact that they were subject to a six-year statute of limitations at the time they were committed. See R.C. 2901.13(A)(1) (which formerly provided a six-year statute of limitations for a felony other than murder or aggravated murder).

¶{141} Although *he admitted below that the statute of limitations had not run for aggravated murder*, appellant now contends that the state should not be permitted to rely on time-barred predicate offenses to prove felony murder. (07/17/08 Tr. 100). He urges that allowing the felony murder charge to go forward would undermine the purposes of the statute of limitations for the predicate offenses.

¶{142} He equates the situation with a double jeopardy situation, citing *Liberatore*. In that case, the jury found the defendant not guilty of aggravated arson but hung on felony aggravated murder (with aggravated arson as its predicate felony). *State v. Liberatore* (1983), 4 Ohio St.3d 13. The Supreme Court held that the acquittal of the predicate offense prohibited re-prosecution for aggravated murder. Id. at 15.

¶{143} However, an acquittal is the result of insufficient evidence and is much different than a procedural inability to proceed with a prosecution due to a statute of

limitations. See, e.g., *State v. Scott*, 8th Dist. No. 83477, 2004-Ohio-4631, ¶17 (the running of the statute of limitations on the predicate offense does not bar prosecution for the compound offense; such situation is different from the case where there is insufficient evidence of the underlying offense and thus the compound offense cannot stand), citing *State v. Stansberry* (July 5, 2001), 8th Dist. No. 78195. See, also, *Jennings v. Jackson*, 102 Ohio St.3d 164, 2004-Ohio-2052, ¶2-3 (a violation of the criminal statute of limitations is not a jurisdictional defect and thus can be waived).

¶{144} Appellant's argument is akin to stating that aggravated burglary, which currently has a twenty-year statute of limitations pursuant to statute and which has theft as an element, actually only has a two-year statute of limitations if the theft is a misdemeanor and a six-year statute of limitations if the theft would constitute a felony. This would improperly defeat the whole purpose of the twenty-year statute of limitations for aggravated burglary, just as appellant's argument here would improperly defeat the legislative intent specifying that there is an unlimited limitations period for any kind of murder or aggravated murder. In support, we refer to the murder statute of limitations and review some cases on point.

¶{145} The essential legal premise here is that *there is no statute of limitations for murder*. The statutory language, "For a felony other than aggravated murder or murder, six years," expresses a clear intent that murder has no statute of limitations no matter what. R.C. 2901.13(A)(1). The elements of aggravated murder may contain the elements of another offense, but nowhere does a rule require each element of aggravated murder to have fallen within any statute of limitations pertinent to an offense that just happens to be encompassed within the individual elements of murder. Thus, the running of a statute of limitations for a predicate offense does not indirectly impose a statute of limitations on felony murder, which has no statute of limitations.

¶{146} Notably, appellant acknowledges cases out of Washington, Arizona, Pennsylvania, and Michigan which have concluded that the expiration of the statute of limitations on the underlying felony does not preclude prosecution for felony-murder. We also point to various Ohio cases coming to this same conclusion.

¶{147} In a case before the Eighth District, the defendant was convicted of aggravated murder and aggravated robbery. *Stansberry*, 8th Dist. No. 78195. The trial court later vacated the aggravated robbery conviction due to the fact that the

statute of limitations had run. Id. The defendant argued that the court should have vacated the aggravated murder conviction on these same grounds because once the underlying felony is vacated, there is no evidence to support felony murder. Id. The Eighth District disagreed and held that a statute of limitations is not created out of the components of an offense just because the component elements constitute offenses that have a statute of limitations. Id. See, also, *Scott*, 8th Dist. No. 83477 at ¶17; *State v. Dawson* (Nov. 18, 1993), 8th Dist. No. 63122 (aggravated murder not barred by fact that statute of limitations for underlying offense of aggravated robbery had expired).

¶{148} The Twelfth District has also held that the running of the statute of limitations for the underlying offenses did not require a dismissal of aggravated felony murder. *State v. Brown* (Oct. 29, 1990), 12th Dist. No. CA89-09-097. That court reasoned that aggravated felony murder is a separate offense from its components. Id. The defendant in that case also cited the general *Liberatore* holding that proof of felony murder requires proof of the underlying felony. Id. The *Brown* court responded to this by pointing out that the limitations statute is separate from the statute defining the elements of an offense and the statutory elements do not contain a time limitation. Id. See, also, *State v. Zanders* (Nov. 22, 1995), 9th Dist. Nos. 17147, 17243 (trial court ruled that if predicate offense's two-year limitations period expired, then the compound offense of involuntary manslaughter must be dismissed; appellate court decided that two-year statute of limitations period for the predicate offenses did not expire, but also held that the six year statute for involuntary manslaughter applied rather than the two year statute for the predicate offenses).

¶{149} In conclusion, the plain language of the statute of limitations provides that aggravated murder has no statute of limitations. See R.C. 2901.13(A)(1). Aggravated murder includes both prior calculation and design killings and purposeful killings during certain predicate felonies. See R.C. 2903.01. The statute of limitations does not say that only the type of aggravated murder that entails prior calculation and design is free from a limitations period. Rather, it includes all murders and aggravated murders, whether they are "felony-murders" or not. Thus, the expiration of a statute of limitations for a predicate or underlying offense does not mean that the compound

offense must be dismissed where the specific statute of limitations has not run for that compound offense. This assignment of error is overruled.

## JURY SELECTION ISSUES

¶{150} The jury selection issues are contained in the following six assignments of error: one, eight, fourteen, fifteen, seventeen, and eighteen.

<u>ASSIGNMENT OF ERROR NUMBER ONE</u>

¶{151} Appellant's first assignment of error provides:

¶{152} "APPELLANT WAS DENIED DUE PROCESS AND A FAIR AND IMPARTIAL JURY WHEN THE TRIAL COURT FAILED TO PERMIT REASONABLE INQUIRY INTO JURORS' EXPOSURE TO PRETRIAL PUBLICITY AND THE JURORS' VIEWS ABOUT THE DEATH PENALTY, AND THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL FAILED TO OBJECT TO THE INADEQUATE PROCEDURES."

¶{153} Appellant complains here that the jury was too hastily assembled, stating that the trial judge bragged about the speed with which jury selection was moving. (Tr. 489). Appellant states that he received only twenty minutes to question each five-person panel about their exposure to pretrial publicity and their views on the death penalty. As counsel expressed no general or specific objections below, appellant claims that the failure to insist on more time on the record constituted ineffective assistance of counsel. Appellant cites to the questioning of various panel members, who ended up sitting on the final jury, to support his claim that there was insufficient time for questioning to determine their qualification to sit under *Morgan v. Illinois* (1992), 504 U.S. 719.

¶{154} Pursuant to *Morgan*, a defendant has a constitutional right to exclude for cause any prospective juror who will automatically vote for the death penalty. Id. at 729. This is because an automatic death penalty juror who will not consider the law regarding mitigating factors is presumed to be biased. Id. In order for a court to deny a challenge for cause regarding a claim of an automatic death juror, the juror must swear that he can set aside any opinion he might hold and that he can decide the case on the evidence, and the court must then believe the juror's claim of impartiality. *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6170, ¶140. See, also, *Patton v. Yount* (1984), 467 U.S. 1025, 1036. Thus, even if a juror seemingly favors automatic death

penalty for the type of offense involved, if the juror then states that he can set his personal opinions aside, follow the law and instructions, and weigh the mitigating factors, the juror is not considered biased and need not be removed. Id. at ¶169, 171.

¶{155} A trial court's resolution of a challenge for cause will be upheld on appeal unless it constitutes an abuse of discretion because it is unsupported by substantial testimony. *Perez*, 124 Ohio St.3d 122 at ¶140, citing *State v. Tyler* (1990), 50 Ohio St.3d 24, 31. Where a juror originally seems "auto death penalty" and where that juror then states upon explanation of the law that he can follow the law and that he can consider the mitigating factors rather than automatically vote for death, the question is one of fact left for the trial court. Id. at ¶172, citing *State v. Jones* (2001), 91 Ohio St.3d 335, 339.

¶{156} An adequate voir dire is key to determining a juror's ability to follow the law. However, a trial judge is master of his courtroom, and may conduct the examination of the potential jurors and then allow follow-up inquiry by the parties. See Civ.R. 47(B). See, also, R.C. 2945.03. The proper scope and manner of voir dire is within the trial court's discretion and varies with the circumstances of each case. See, .e.g., *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981; ¶28; *State v. Bedford* (1988), 39 Ohio St.3d 122, 129 (limits placed on the scope must be reasonable). *Bedford*, 39 Ohio St.3d at 129.

¶{157} More specifically, *time limits on voir dire are within the trial court's discretion.* *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 21; *State v. Nields* (2001), 93 Ohio St.3d 6, 28; *State v. Cornwell* (1999), 86 Ohio St.3d 560, 565-566; *State v. Seiber* (1990), 56 Ohio St.3d 4, 12. Moreover, an appellant must show that the trial court's limits constituted a clear abuse of discretion. *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, ¶31.

¶{158} "Crim.R. 24(A) requires that counsel be given an opportunity to question prospective jurors or to supplement the court's voir dire examination. Accord R.C. 2945.27. But restrictions on voir dire have generally been upheld." *Jackson*, 107 Ohio St.3d 53 at ¶28. "Although R.C. 2945.27 affords the prosecution and defense the opportunity to conduct a reasonable examination of prospective jurors, * * * the trial court reserves the right and responsibility to control the proceedings of a criminal trial pursuant to R.C. 2945.03, and must limit the trial to relevant and material matters with

a view toward the expeditious and effective ascertainment of truth." *State v. Durr* (1991), 58 Ohio St.3d 86, 89.

¶{159} Here, voir dire lasted three days constituting nearly 800 pages of transcript. The potential jurors had completed extensive jury questionnaires. See *Seiber*, 56 Ohio St.3d at 12. An hour was scheduled for each five-member panel on solely pretrial publicity and death qualification issues, with each side receiving twenty minutes. (Tr. 17). The five-juror panels were questioned not only by the prosecutor for twenty minutes and the defense for twenty minutes but were also questioned by the court. See *Nields*, 93 Ohio St.3d at 28 (noting that both sides were subject to the same limits). Subsequent voir dire of the remaining jurors on other topics occurred at another time. Consequently, counsel was not required to spend time delving into other matters during his twenty minutes of questioning.

¶{160} Although appellant states that limiting his questioning on publicity and death qualification to twenty minutes meant that he had only four minutes per juror, it must be recognized that the questions are posed to the entire panel of five. Each juror need not be individually focused upon unless they answer a question to the panel in a worrisome fashion. For instance, counsel need not individually ask each juror if he heard about the case in the newspaper, television, or radio. Rather, counsel can ask the panel as a whole, and only follows up if someone answers in the affirmative. It is also important to recognize here that appellant already had the benefit of hearing the jurors' answers to the trial court's and then the state's questions on these topics. Appellant also had the jurors' questionnaire answers on these topics.

¶{161} From reviewing the record and reading the transcript, it can be seen that the jurors were thoroughly questioned regarding their knowledge of the case, whether they had formed any fixed opinions regarding appellant's guilt, whether they would have difficulty imposing life instead of death, and whether they could decide the case solely on the evidence presented at trial. *Jackson*, 107 Ohio St.3d 53 at ¶31 (voir dire is sufficient if it shows that jurors can set aside any impression formed due to pretrial publicity and decide the case solely on the law and evidence presented at trial). As will be outlined below, the trial court excused jurors who had formed fixed opinions as a result of pretrial publicity, those who could not impose life, and those whose views against capital punishment substantially impaired their duties. In general, we can

discern no overarching issue making the time limits per se unreasonable. As determined infra, appellant's particular *Morgan* claims regarding specific jurors are also without merit.

¶{162} We now address appellant's complaint relative to specific jurors. As to Juror Number 81, the court established that she came to court knowing nothing about the case. (Tr. 301). The prosecutor established that she would not ignore the defense's mitigating factors just because the defendant had already been convicted of aggravated murder with a capital specification and that she would not automatically impose the death penalty. (Tr. 323-324). Defense counsel asked questions of this juror and voluntarily stopped the session without being cut off. (Tr. 344). The record does not support a contention that she had already formed an opinion or that death was predetermined upon a finding of guilt. Nor does it support a claim of insufficient time for inquiry on these issues.

¶{163} As to Juror Number 18, appellant points out that he originally stated that unless there was self-defense, he "would probably go along with the death penalty." (Tr. 169). Defense counsel then noted the law on mitigating factors, and the juror clarified that after a finding of guilt, he "would consider the death penalty," that the death penalty would not be automatic for him, and that he would also consider the other options. (Tr. 170-171). The sincerity of his answer on this topic is a factual question for the trial court. *Perez*, 124 Ohio St.3d 122 at ¶172. Moreover, on his own accord without prompting by the court, counsel moved on to question Juror Number 17 and then Juror Number 228. (Tr. 171-172). There is no indication that the defense did not have adequate time to voir dire Juror 18. Finally, as appellant points out, the court had already decided (with both sides' consent) to excuse Juror 18 for medical reasons. (Tr. 61-62). That he still appeared on the panel thereafter does not reveal some major flaw in the proceedings. He was later re-excused from the panel. (Tr. 753-755).

¶{164} As to Juror Number 77, this juror voiced a belief in the death penalty depending on the facts presented. (Tr. 318, 341). When asked if anyone would automatically vote for death after finding the defendant guilty, this juror did not respond and thus responded that she would not automatically vote for death. (Tr. 323-324). Later, when asked if there were situations when death is not appropriate, the juror

responded, "Certainly." (Tr. 341). There is no indication that counsel needed more time to question her further.

¶{165} Regarding Juror Number 239, appellant thinks she shows a preference for death that he could not properly delve into. She had not previously heard about the case. (Tr. 352). Upon questioning by the court, she did not state that she was in favor of the death penalty in every case where a murder is committed. (Tr. 356-357). When asked if she could sign a death verdict, she expressed reservations and worried about her safety. (Tr. 374). She was then told that she would not be filmed and no one would know her name except the parties, and she then said that she would be able to stand up during the polling of a death verdict. (Tr. 374-375). Upon questioning by the defense, she denied that if she found the defendant guilty at trial, he would automatically receive a death sentence, and she voiced that she could start over fresh at sentencing with an open mind. She stated that she would listen to and weigh the mitigation evidence. (Tr. 383). Her credibility is for the trial court. Thus, appellant's argument is not supported by the record.

¶{166} As for Juror Number 218, appellant states that he had no time to probe whether this juror would automatically vote for death if a guilty verdict were returned. First, we note that this juror had not heard about the case prior to trial. (Tr. 97-99). When the court asked if any jurors on the panel believed that death should be imposed in every case where murder has been committed, only one juror agreed, and it was not Juror Number 218. (Tr. 100). In fact, Juror Number 218 agreed to consider the defense's mitigating factors. (Tr. 103). Additionally, she stated that she could impose death if the aggravating circumstance outweighed the mitigating factors. (Tr. 106).

¶{167} When the defense asked her how she felt about sitting on a death penalty case, she responded that it was going to be hard. (Tr. 124). She explained that she would listen to both sides, pay attention, and weigh both options. (Tr. 124). She agreed to consider the mitigating factor of participation in prison programs. (Tr. 127). She answered that she would have no problem imposing a life option if the state did not prove that the aggravating circumstance outweighed the mitigating factor. (Tr. 128-129). Defense counsel stated to the panel of five that he had one last thing to briefly ask. Merely because the court then told defense counsel that he had one minute left does not suggest that the defense did not get to sufficiently ask its final

question. (Tr. 131). Contrary to appellant's argument, there is no indication of insufficient time to voir dire this juror on whether she would automatically vote for death.

¶{168} As for Juror Number 228, this juror stated that she did not think all aggravated murder cases warrant the death penalty. Juror Number 228 stated that it depended on the circumstances, such as if someone is mentally ill or not cognizant of what they were doing as opposed to a defendant who knew exactly what he was doing. (Tr. 161-162). Later, upon questioning by the defense, this juror stated that she could consider a life sentence. (Tr. 172). The juror then stated that if the defendant committed the offense with purpose, then "I will definitely -- I have no problem voting for the death penalty."

¶{169} Still, the juror added, "Now if there are some mitigating factors that come out in the sentencing phase and that, I could consider a lesser penalty." (Tr. 173). When the defense noted that there would be no claim of mental illness and inquired what evidence would make her think death is not appropriate, she did not answer. (Tr. 174). When given an example such as participation in productive prison programs, she said it might make her consider something other than death. (Tr. 182). There is no indication that the defense did not have enough time to probe her answers, and notwithstanding her answers, the defense did not seek to challenge her for cause.

¶{170} Appellant next argues that he had to waste a peremptory challenge on Juror Number 232. (Tr. 757-758). She apparently indicated in her questionnaire that death is the proper punishment in all cases of aggravated murder. (Tr. 222). She was surprised to learn that not all aggravated murders are punishable by death. (Tr. 193-194). Upon questioning, she stated that she would consider whatever the defense presents as mitigating factors and that she would not immediately sentence the defendant to death just because she found him guilty of aggravated murder. (Tr. 206-207). Upon further questioning by the defense, she again expressed that in an aggravated murder case where someone purposely takes a life, she believes that the death penalty is always appropriate. (Tr. 223, 227). She admitted that she would go into sentencing believing death is appropriate. (Tr. 225-226).

**¶{171}** The court then instructed the panel what the law requires. The court stated that the jurors are required to consider the mitigating evidence and cannot automatically dismiss it and impose death. (Tr. 233). Juror Number 232 then stated that she would consider the mitigating evidence put before her, that she would not automatically vote for death, and that she would put the state to its burden to prove beyond a reasonable doubt that the aggravating circumstance outweighs the mitigating factors. (Tr. 235). She concluded that she could put aside personal beliefs and follow the law as the court gives it. (Tr. 241).

**¶{172}** The defense tried to have Juror Number 232 excused for cause on the grounds that she stated that there was no mitigation evidence that could be offered where someone purposely killed another that would make the death penalty not appropriate. (Tr. 240). The court overruled the challenge stating that once the court instructed on the law, this juror did not have a problem with it. The court noted that when counsel asks those types of questions without giving the jurors the law first, such answers are common. (Tr. 241).

**¶{173}** This is a reasonable statement. It was within the trial court's discretion to believe that this juror meant it when she responded that she would consider the mitigating evidence put before her, that she would not automatically vote for death, and that she would put the state to its burden to prove beyond a reasonable doubt that the aggravating circumstance outweighs the mitigating factors. See *Perez*, 124 Ohio St.3d 122 at ¶140.

**¶{174}** In reviewing the voir dire as a whole and the specific complaints raised by appellant here, we conclude that the voir dire on pretrial publicity and death penalty views was not unreasonably limited in a manner that would constitute plain error or ineffective assistance of counsel. The time limits were reasonable. If a certain situation required a bit more time, counsel could have asked for more time due to a particular circumstance that arose regarding a particular juror. Where counsel did not, we presume counsel felt satisfied with the questioning. See *State v. Calhoun* (1999), 86 Ohio St.3d 279, 289. As such, the above arguments are overruled.

**¶{175}** Appellant also complains here that the court "bullied" certain jurors, ensuring that they would sign a death verdict in the future. In the jury questionnaire, Juror Number 82 stated that the death penalty is proper with few exceptions but then

stated that he could never vote to impose it. (Tr. 363). This juror reiterated that it was a moral belief that he could not impose death on another. (Tr. 366). The court advised this juror that the law requires a death sentence when the jury believes that the aggravating circumstance outweighs the mitigating factors. (Tr. 370). The court then complained about jurors who were not opposed to the death penalty but say they do not want to be the one who signs the verdict. (Tr. 371). The court said that it would be juror misconduct to not sign a verdict if the law required it. (Tr. 371-372). The court then asked if Juror Number 82 could follow the law and sign a verdict if it was appropriate, and the juror responded affirmatively. (Tr. 372).

¶{176} The state wished to excuse this juror due to his initial statements that he could not sign a death verdict and its belief that the juror only changed his mind to appease the court. (Tr. 394-395). The court overruled the challenge. (Tr. 395). The defense moved to strike the entire four-person panel, stating that the court's statement to Juror Number 82 could be construed as directing the jurors to enter a death verdict. (Tr. 395-396).

¶{177} On appeal, appellant states that the court's statement was coercive in favor of a death verdict and notes that Juror Number 82 ended up sitting on the jury as well as Juror Number 92 and Juror Number 239, who were members of that questioning panel. However, neither Juror Number 92 nor Juror Number 239 ever expressed a problem voting for death if the aggravating circumstance outweighed the mitigating factors. (Tr. 365-367). Thus, this coercion argument would not really apply to them and would only apply to Juror Number 82. In any event, the court's statement did not favor death. Rather, it set forth that the law requires a juror to impose death if he finds beyond a reasonable doubt that the aggravating circumstance outweighs the mitigating factor. Specifically, the statute provides:

¶{178} "If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury *shall* recommend to the court that the sentence of death be imposed on the offender." R.C. 2929.03(D)(1) (emphasis added).

¶{179} This is the point the court was conveying to the juror. The court did not coerce the signing of a death verdict. Rather, it had to be determined whether the

juror was able to sit because if he could not impose death even though the law required it, then he would have to be excused for cause as requested by the state. The court believed that this juror could follow the law, and even if the court were wrong, this would have only benefited the defendant, not the state.

¶{180} The same goes for appellant's claim regarding Juror Number 110. This juror originally thought death was appropriate in all murder case. Yet, after the court explained the law, this juror agreed that he could follow what the law required. (Tr. 408-409). A changed viewpoint after a juror learns the proper law does not indicate coercion. Regardless, this venireperson did not end up sitting on the jury, and appellant did not have to use a peremptory challenge to excuse him. For all of these reasons, appellant's arguments regarding coercion are without merit.

¶{181} Finally, appellant sets forth an argument that the court placed an improper burden on the defense during voir dire of a five-member panel. At the penalty phase, the defense has the burden of going forward with evidence of mitigation, and the state then has the burden to show that the aggravating circumstance, of which the defendant would have already been found guilty, is sufficient to outweigh the mitigating factors presented. R.C. 2929.03(D)(1). Appellant refers us to the court's statement:

¶{182} "Then the burden is on the defense to give you mitigating factors to persuade you to believe that death is not the appropriate penalty * * *." (Tr. 293-294).

¶{183} The defendant does not have a burden of persuasion; however, the burden is on the defense to *present* mitigation factors. Contrary to appellant's claim, the "to persuade you" portion of the court's statement was not necessarily connected to the "burden" portion of the sentence but seemed more of a general and obvious purpose or hope of the defense. In addition, this statement is taken out of context. It was made to one juror for the purpose of determining whether she would consider the mitigating factors, rather than automatically vote for death. (Tr. 293-294). It did not appear to affect the qualification process.

¶{184} Moreover, the parties displayed a chart for the jury showing the trial and penalty phases, and it was utilized for this panel while defense counsel properly expressed the state's burden applicable to the penalty phase. (Tr. 279-281). All presumably while there was *no objection* to the court's innocuous statement. Lastly,

we note that the court properly provided the burden at the penalty phase.  (Sent. Tr. 161-162).  This assignment of error is overruled.  (We note that arguments regarding some jurors were moved from this assignment to other more relevant assignments under the jury selection heading.  For instance, Jurors 55 and 233 are discussed in assignment of error number fifteen.)

ASSIGNMENT OF ERROR NUMBER EIGHT

¶{185} Appellant's eighth assignment of error contends:

¶{186} "APPELLANT WAS DENIED THE TRIAL BY A FAIR AND IMPARTIAL JURY BECAUSE THE COMMUNITY IN WHICH THE CASE WAS TRIED WAS STEEPED IN PRETRIAL PUBLICITY, AND APPELLANT'S TRIAL COUNSEL FAILED TO FILE A NON-SPURIOUS PRETRIAL MOTION FOR CHANGE OF VENUE OR DEVELOP A RECORD TO DEMONSTRATE ACCURATELY THE EFFECTS OF PRETRIAL PUBLICITY, THUS DEPRIVING APPELLANT OF LIBERTIES SECURED BY [THE CONSTITUTION] [CITATIONS OMITTED]."

¶{187} Appellant states that the voir dire record shows that there were jurors with knowledge of the case due to pretrial publicity.  Appellant claims that his counsel was ineffective for failing to seek a change of venue and for failing to make a proper record of the pretrial publicity.  Appellant also complains that due to the lack of individual, segregated questioning, those who ended up sitting on the jury heard the pretrial publicity to which others on their five-member panel had been exposed.

¶{188} Appellant briefly cites to Juror Number 99, who stated that he had been following the case in the newspaper since the start.  (Tr. 400).  The court decided to continue interviewing this juror outside the presence of the other five on the panel.  (Tr. 401).  It was disclosed that he heard that they found DNA linking the defendant to the crime, that the victim was afraid of the defendant, that she asked her mother to come pick her up just before her murder, and that they found the body in the Mahoning River.  (Tr. 402-403).  He also remembered that the defendant lived below the victim in the same building and that they found her ATM card in the defendant's possession.  (Tr. 403).  He disclosed that he probably cannot be fair and consider only the evidence presented in court.  (Tr. 403-404).

¶{189} Because this juror was questioned outside the presence of the other jurors and immediately excused for cause by the court, there is no indication of

influence on the other panel members. Contrary to appellant's suggestion, an adequate voir dire did not require this juror to be questioned as to whether he discussed his knowledge with other jurors. The venire had been admonished not to discuss the case amongst themselves, and there was no indication that this juror spoke with others thereafter. Lastly, the information known to this juror does not establish a community inundated with inflammatory news regarding the defendant's guilt. See *State v. Yarbrough*, 95 Ohio St.3d 227, 241, 2002-Ohio-2126. Cf. *Sheppard v. Maxwell* (1966), 384 U.S. 333 (massive pretrial publicity, media commotion in courtroom). This is especially true since the crime here occurred in 1985.

¶{190} We thus move to evaluate the first four panels, which appellant cites as evidence that the comments of certain jurors influenced other jurors. Prior to jury selection, the court instructed all potential jurors that they may not read, view, or listen to any report on the subject of the trial. The court stated that the reports are "sometimes, or in my opinion, mostly inaccurate." The court admonished that they can only consider and decide the case based upon the evidence received at trial. (Tr. 8).

¶{191} Thereafter, the five-member panels were questioned regarding two subjects: pretrial publicity and death penalty qualifications. On the first panel, two jurors answered that they had previously heard about the case on television. (Tr. 97-98). Juror Number One, who did not end up sitting on the jury, heard that the case involved a rape but did not hear that it also involved a murder. He stated that he knew nothing of the actual facts and did not form an opinion based upon what he heard. (Tr. 98). Juror Number 226, who sat as a juror on the trial, heard merely that the defendant was up for rape and murder charges and that jury selection was beginning. (Tr. 98-99). These two jurors' exposure to pretrial publicity was minimal. That two other jurors heard them tell the court that they heard what certain charges were is not prejudicial. In fact, the court had already told the panel what the charges were.

¶{192} Appellant then takes issue with the second panel. Juror Number 17 and Juror Number 228 from this panel ended up sitting on the jury. Juror Number 17 disclosed that he saw a headline regarding jury orientation and that he heard the crime occurred in 1985. (Tr. 137-138). When asked if he formed any opinion as to the guilt or innocence of the defendant, he answered, "No. I don't know anything." (Tr. 138).

Juror Number 228 disclosed only that he heard that jury selection was beginning and disclosed that he had not paid attention to the whole story. (Tr. 142).

¶{193} Another juror on this panel disclosed that he saw a picture of the defendant on television from when he was younger accompanied by "the whole story on what had happened." (Tr. 138). The court then asked what he heard, and he stated that appellant had been released because there was not enough evidence. He answered that he had not formed an opinion on the defendant's guilt and that he could give him a fair and impartial trial. (Tr. 139).

¶{194} Yet another juror on this panel stated that she read an article in the local newspaper which contained many details about the murder and the victim. She specified that the article said the victim had been harassed and stalked. The court asked if she believed everything she read. (Tr. 140). The juror stated that she had not formed an opinion as to guilt based upon what she read and that she could give the defendant a fair and impartial trial. (Tr. 140-141).

¶{195} Out of the third group of five, Juror Number 44, who ended up sitting on the jury, stated that his wife read a newspaper article and told him that he was likely sitting on one of the two cases listed therein. (Tr. 236). He stated that he did not know any facts in the case and that he had not formed an opinion on guilt. (Tr. 236-237). Juror Number 31 stated that she saw something about the trial on the news but did not form an opinion based upon that pretrial publicity. (Tr. 237).

¶{196} In the fourth group, Juror Number 220, who ended up sitting on the jury, was present when two other panel members were questioned about the pretrial publicity. Juror Number 55 revealed that she read in the newspaper that a YSU girl had been murdered. She noted that they had not found anyone in twenty-two years but they had recently matched appellant's DNA with the evidence. (Tr. 244) The court instructed that only the evidence can be considered and stated that the newspaper does not report evidence. (Tr. 235-246). Juror Number 55 then stated that she had not formed an opinion yet and that she could consider the evidence and be fair. (Tr. 245, 247).

¶{197} Juror Number 60 disclosed that she heard the same information from the newspaper as relayed by Juror Number 55. (Tr. 247). When asked if he formed an opinion, he stated that his opinion was that, due to the DNA, appellant was guilty.

(Tr. 248). This juror was excused for cause by the court. The court then asked if the other jurors had been influenced by the comments of these two jurors regarding DNA and if there was anyone who could not give appellant a fair and impartial trial. (Tr. 248-250). The other jurors did not respond. (Tr. 250). Later, the defense asked to excuse the other members of the panel since they heard the pretrial publicity comments. (Tr. 298). As aforementioned, appellant believes counsel should have also sought a change of venue after hearing these answers.

¶{198} A trial court may change venue "when it appears that a fair and impartial trial cannot be held" in that court. Crim.R. 18(B); R.C. 2901.12(K). Thus, a change of venue is not automatically granted when there is pretrial publicity. *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶229. A decision to change or retain venue rests largely within the discretion of the trial judge. Id. The trial court also occupies the best position to judge each juror's demeanor and answers regarding their ability to be fair. *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, ¶64.

¶{199} In reviewing the entire voir dire, the trial court excused jurors whose exposure to pretrial publicity prohibited them from fairly considering the evidence presented at trial. Seven of the twelve empanelled jurors had never heard of the case before. Most of the veniremen with some information actually had heard very little. Defense counsel had the opportunity to further question the jurors about exposure but did not. This is not deficient because counsel need not rehash topics already covered by group voir dire, opposing counsel, or the judge. *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, ¶47; *State v. Watson* (1991), 61 Ohio St.3d 1, 13. Contrary to appellant's contention, there is no indication that counsel lacked sufficient time to inquire about pretrial publicity; instead, it appears counsel was satisfied with the court's questioning regarding the matter.

¶{200} Where there are no extraordinary circumstances of a passion-filled community pervaded with publicity about the defendant's guilt and a circus-like trial, a defendant must demonstrate that a juror was actually biased in order to claim that pretrial publicity denied him a fair trial. *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, ¶29. This appellant has failed to do so regarding the jurors who merely heard other jurors relate some information that they had learned from the media. See *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶98 (the reviewing court does not

speculate that a venireperson is biased because he heard a fellow venireperson's answers in voir dire). Contrary to appellant's suggestion, there is no requirement that voir dire must be conducted in sequestration in a capital case. Id. at ¶96, citing *State v. Fears* (1999), 86 Ohio St.3d 329, 338. Furthermore, a fair jury need not be one totally oblivious to any facts about the case prior to trial. *Gross*, 97 Ohio St.3d 121 at ¶38 (trial court can accept juror's assurances that they can be fair and judge case only on evidence presented).

¶{201} Finally, just as in *Davis*, counsel need not put pieces of pretrial publicity on the record to avoid rendering ineffective assistance of counsel. See *Davis*, 116 Ohio St.3d 404 at ¶50. The court was made aware of the relevant pretrial publicity by the jurors themselves. See id. It also does not appear that the decision not to seek a change of venue was ineffective; rather, it was a reasoned decision made after seeing and hearing the jurors during voir dire. See id. at ¶49. Defense counsel's decision on whether to seek a change of venue is considered mostly a matter of trial strategy. *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, ¶156. For all of these reasons, this assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER FOURTEEN

¶{202} Appellant's fourteenth assignment of error argues:

¶{203} "[CONSITUTIONAL PROVISIONS] [CITATIONS OMITTED] WHICH MANDATE A TRIAL BY A FAIR AND IMPARTIAL JURY, REQUIRE A COURT TO EITHER CONDUCT AN INVESTIGATION OR PERMIT AN INVESTIGATION TO BE CONDUCTED WHEN THERE APPEARS ANY INDICIA OF JUROR MISCONDUCT, AND THE TRIAL COURT ERRED WHEN IT FAILED TO DO SO."

¶{204} Prior to jury selection, the court advised the jury that it would be administering admonitions to the jury which constituted a court order, the violation of which was punishable as contempt of court. The court then instructed the jurors not to discuss the case among themselves or to permit anyone to discuss the case in their presence. (Tr. 6). The court recognized that it may be difficult to understand why they were not permitted to discuss the case amongst themselves until it is finally submitted and explained that it would be unfair to discuss the case until they received everything necessary to reach an informed verdict. (Tr. 6-7). The court then stated that they could not converse with the parties, attorneys, or witnesses during trial. The court

announced that if anyone attempted to discuss the case with them, they should report the incident immediately. (Tr. 7).

¶{205} Jurors with the numbers 173, 175, and 176 were on the same voir dire questioning panel. After their voir dire, the state moved to excuse Juror Number 173 for cause, and the defense had no objection. (Tr. 538). Defense counsel asked to approach the bench, and an off-the-record discussion was held. The court then spoke with a different juror, Juror Number 175, alone in chambers. The court came back on the record stating that it heard reports that Juror Number 175 smelled of alcohol. The court disclosed that the juror said he had drinks the night before but had nothing to drink that day. (Tr. 538). The court stated that it warned the juror that he could not come to jury duty hung over because he would have a job to do. (Tr. 539).

¶{206} Defense counsel moved to excuse Juror Number 175, arguing that he could smell the alcohol from eight to ten feet away and noting that the prosecutor smelled it too. (Tr. 539-540). The court refused, asking the record to reflect that Juror Number 175 did not look intoxicated, pointing out that his eyes were clear and he did not slur his words. (Tr. 541). Defense counsel also wished to excuse this juror for cause due to his views about the death penalty and death row. (Tr. 539). The court refused, noting that the juror stated that he could put aside his opinion, follow the law, and fairly consider the mitigating factors. (Tr. 541).

¶{207} The court then adjourned after summarizing some of its prior admonitions for Jurors 175 and 176. (Tr. 543). The next day, the court reopened and announced that Juror Number 176 was in court without the rest of the jurors. (Tr. 599). The following colloquy took place:

¶{208} "THE COURT: What happened is yesterday it came to my attention that when you, Juror 175, and Juror 173 were in the hallway, Juror 175 was talking about the victim or I can't forget the victim, that type of thing.

¶{209} "JUROR NO. 176: Um-hum.

¶{210} "THE COURT: Did that have -- I have to ask this and we have to ask it on the record, did that have an effect on you?

¶{211} "JUROR NO. 176: No.

¶{212} "THE COURT: Okay. You can still be a fair and impartial juror?

¶{213} "JUROR NO. 176: Yes.

¶{214} "THE COURT: Basically, you didn't pay any attention to him?

¶{215} "JUROR NO. 176: That's what he was talking about. It didn't affect me.

¶{216} "THE COURT: He's been removed because of that because I gave the admonitions not to talk about the case. That's all I had to ask you. We had to have it on the record. Does anyone wish to inquire?" (Tr. 600).

¶{217} Neither side wished to further inquire into the situation. (Tr. 601). However, appellant now contends that the court erred in failing to sufficiently investigate Juror Number 175's misconduct stating that the court should have inquired as to whether there were others exposed to this juror's misconduct. Appellant also argues (moved from assignment of error number eight) that the court erred in failing to record the removal of Juror Number 175.

¶{218} Defense counsel apparently believed that the court sufficiently investigated the matter, and did not take the opportunity to further question this Juror Number 176. See *State v. Zander*, 9th Dist. No. 24706, 2010-Ohio-631, ¶75 (defendant cannot sit idly by hoping for a favorable verdict and then assert deficiency in investigating juror misconduct, which was capable of being remedied at the time of its occurrence). Defense counsel had no issue with the court's interviewing of Juror Number 175 in chambers regarding whether he was drunk. Nor did defense counsel contest the off-the-record removal of Juror Number 175.

¶{219} Due to the absence of an objection, the state claims any error is waived absent plain error. See *State v. Sanders* (2001), 92 Ohio St.3d 245, 253 (where defense complains of sleeping juror and judge announces that there is too much sleeping going on so the courtroom temperature will be lowered, any error in failing to investigate whether juror missed any testimony is waived where the defense does not ask for a hearing). Plain error "may" be recognized only upon a demonstration of an obvious and outcome-determinative error. *State v. Barnes* (2002), 94 Ohio St.3d 21, 27; Crim.R. 52(B). Appellant also raises ineffective assistance of counsel.

¶{220} We begin our review with the claim that Juror Number 175 was removed off the record, an argument relocated from assignment of error number eighteen. Initially, we note that this situation is distinguishable from the case cited by appellant. In *Clinkscale*, defense counsel notified the court that it made a deficient record. *State*

*v. Clinkscale*, 122 Ohio St.3d 351, 2009-Ohio-2746, ¶16-17. Moreover, *Clinkscale* dealt with removal of a sitting and deliberating juror, who was argued to be a lone dissenter, whereas we are confronted only with the excusing of a venireperson. See id. at ¶14, 18. Importantly, the defense here wanted Juror Number 175 removed for cause the day before this incident for two separate reasons. Accordingly, we do not find error for the removal of a juror the day after defense counsel requested same. The defense got what it requested, albeit for a different reason.

¶{221} In addition, the court did place the fact of excusal on the record. (Tr. 600). The fact that the court used the terminology "he's been removed" rather than "he is being removed" does not necessarily mean some significant unrecorded event took place. The fact that the court did not personally tell Juror Number 175 that he was being excused on the record is not dispositive. A juror's removal is often placed upon the record outside of their presence, and they are then administratively told, by being given a card, that they are excused. Furthermore, the record, even in a capital trial, need not be perfect. See *Clinkscale*, 122 Ohio St.3d 351 at ¶13, citing *State v. Palmer* (1997), 80 Ohio St.3d 543. Thus, the failure to recall this venireperson to the stand to personally tell him that he was being excused is not error where the record reflects that the person was excused and the reasons therefor.

¶{222} On another briefly raised topic (the source of the court's knowledge that Juror Number 175 smelled of alcohol), we find that the record shows that defense counsel was the source of the complaint as he insisted that he could smell alcohol from eight to ten feet away and noted that the prosecutor could smell it as well.

¶{223} Finally, investigating whether this juror was drunk off-the-record in chambers is not plain error. Counsel may have strategically decided that it would be too embarrassing for Juror Number 175 to be questioned in front of all of the attorneys and the defendant and that allowing the court to do it alone was the best tactical decision. The lack of recording is not prejudicial as the real point was the juror's demeanors, gestures, and physical condition, i.e. whether his eyes were red or glassy, whether he slurred his words, whether he stumbled, whether his breath smelled like he had recently consumed alcohol, etc. These are all things that would not translate into a record for our purposes. It is also not prejudicial considering the fact that the

defense adamantly wanted this juror off the panel for two separate reasons, and they ended up getting their wish.

¶{224} We move on to the investigation of this juror's comments to his fellow panel members. It is a long-standing tenet that a judgment shall not be reversed because of the misconduct of a juror unless the complaining party demonstrates prejudice. See, e.g., *State v. Sheppard* (1998), 84 Ohio St.3d 230, 233; *State v. Keith* (1997), 79 Ohio St.3d 514, 526; *State v. Hipkins* (1982), 69 Ohio St.2d 80, 83. See, also, Annotation, Propriety and Effect of Jurors Discussion of Evidence among Themselves before Final Submission of Criminal Case, 21 ALR 4th 444. The presumption of prejudice in *Murphy*, a case cited by appellant here, deals with cases where there was outside communication with a jury about substantive matters concerning the pending case, and even that the presumption is rebuttable. *State v. Murphy* (1992), 65 Ohio St.3d 554.

¶{225} The extent of an investigatory voir dire is within the sound discretion of the trial judge. *State v. Webb* (1994), 70 Ohio St.3d 325, 338. In *Webb*, a spectator advised that she heard a venireperson, who had been excused by a peremptory challenge, loudly announcing the defendant's guilt to a black man and woman during a voir dire recess. The court interviewed the one black male juror on whether he heard the comment because he was the only juror who fit the spectator's description of the two people standing with the loud venireperson. This juror stated that he did not hear any comments. On appeal, the defendant insisted that the trial court should have interviewed the whole jury. However, the Supreme Court disagreed, stating that the court did everything defense counsel asked and that the court could reasonably find that the matter did not require further investigation. Id.

¶{226} The comment here is not the type of statement that would have prejudicially affected appellant's substantial rights. In fact, it was not even a discussion of the case itself, and is not as extreme as cases where a panel member announces a defendant's guilt. Juror Number 176 was thoroughly questioned about whether she had been influenced by Juror Numbers 175's statement to her and Juror Number 173 about remembering the victim. She swore that it did not affect her. Juror Number 173 had already been excused by the time the court was presented with the information and thus was not recalled for questioning.

**¶{227}** Appellant suggests that Juror Number 176 violated the court's admonitions by concealing Juror Number 175's comment. As aforementioned, the comment was not shown to be an extreme or a clear violation that would trigger a panel member's absolute reporting duty. In any event, concealment by Juror Number 176 is not demonstrated by the record: the comment was made one afternoon, and she was on the stand the next morning providing a sworn statement that the comment did not affect her at all.

**¶{228}** Furthermore, the comment occurred during jury selection rather than during trial, and the state later exercised a peremptory challenge regarding Juror Number 176. (Tr. 760). Thus, neither the speaker nor the two listeners ended up on the jury. In addition, the court did establish that Juror Number 175 was speaking to only two other jurors at the time: Juror Number 173 and Juror Number 176. It is also noteworthy that these three were the only members of the questioning panel on the afternoon on which the comment occurred. (Tr. 94, 505).

**¶{229}** Contrary to appellant's suggestion, if an offending juror speaks to two other jurors, we do not presume that the entire panel is tainted. See *Webb*, 70 Ohio St.3d at 338 (where venireperson loudly and boisterously announced the defendant's guilt during a voir dire recess). See, also, *State v. Phillips* (1995), 74 Ohio St.3d 72, 89 (jurors who heard other jurors comment stated that the statement would not influence their decision). There were no errors committed by the court or counsel here. In accordance, this assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER FIFTEEN

**¶{230}** Appellant's fifteenth assignment of error alleges:

**¶{231}** "THE TRIAL COURT ERRED WHEN IT IMPROPERLY EXCUSED JURORS 55 AND 233, THUS DEPRIVING APPELLANT OF AN IMPARTIAL JURY THAT REPRESENTED A FAIR CROSS-SECTION OF THE COMMUNITY, AS DEMANDED BY [THE CONSTITUTION] [CITATIONS OMITTED]."

**¶{232}** Juror 55 stated that she read in the newspaper that a college girl had been murdered and the defendant was arrested because his DNA matched. (Tr. 243-244). When asked if she had formed an opinion, she answered, "Well, it's hard to answer. I would say if you haven't found anybody in 22 years that committed the murder and his DNA matches --." (Tr. 244). Upon further questioning though, she

stated that she had not yet formed an opinion, that she thought she could give the defendant a fair trial, and that she could put aside what she read in the newspaper. (Tr. 245-247).

¶{233} This juror's questionnaire indicated that the death penalty should be imposed in all death penalty cases, and she added at voir dire that it should be imposed in all aggravated murder cases. (Tr. 267). She was then asked if she thought death should be automatic upon the finding of guilt or if she thought the case should go to the sentencing phase, and she chose the latter. She agreed that she would follow the law and consider any mitigating factors provided and then acknowledged that the death penalty should not be imposed in every case and stated that she was wrong to write that it should be imposed in all cases. (Tr. 268-269, 278-279, 281, 294).

¶{234} However, Juror Number 55 then stated, "You didn't ask me if I could sign the paper. That's the thing I could not do. * * * I agree with the death penalty, but I can't agree to it." (Tr. 273-274). She added, "I just couldn't. It would make me a nervous wreck. I can't do it." (Tr. 294). When asked to explain, she repeated, "I just couldn't sentence him to death myself. I just could not." (Tr. 295).

¶{235} Juror Number 233, a panel member being questioned at the same time as Juror Number 55, indicated in her questionnaire that she was opposed to the death penalty. When the court asked if anyone was religiously, morally, or otherwise opposed to the death penalty, Juror Number 233 stated that because of her religious beliefs and the chance of executing an innocent, she is against the death penalty. She then stated that if she were selected, she would nevertheless follow the court's instructions and fairly consider imposition of the death penalty. (Tr. 253).

¶{236} The court asked her if she could sign a death verdict, and she responded, "It would be hard, but if you said, yes." The court then explained that it could not make her sign and asked her whether she could sign if she found the aggravating circumstance outweighed the mitigating factors. She answered, "I have a real hard time with it." (Tr. 254). The court stated that they needed to know definitively, and she answered, "I can't." (Tr. 254-255). When asked if this would be true in all cases, she stated she might be able to sign a verdict if it were a terrible crime that was premeditated and cruel. (Tr. 255, 284).

**¶{237}** Upon questioning by the state, Juror Number 233 stated that her views on capital punishment would not affect her ability to find the defendant guilty at the initial trial phase. (Tr. 263). She then twice reiterated that she could not sign a death verdict. (Tr. 264, 271). Upon questioning by the defense, she disclosed that although she previously stated that she could vote death under the right circumstances, "I just don't think I can do it." (Tr. 285). However, she then said she could follow the law and vote for death if she had to. (Tr. 286). The court followed up by stating: "if you believe that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt, you have to sign a verdict form for death. Can you sign that?" Juror Number 233 answered that she could not. (Tr. 295).

**¶{238}** Thereafter, the court stated that it was excusing Jurors 55 and 233 because they could not sign a verdict form. (Tr. 295-296). The defense only objected to the excusal of Juror Number 233. The court said, "She said she couldn't. She's all over the place, but she can't do it. So you want me to keep them both?" (Tr. 296). The defense said no and argued that Juror Number 55 was "much stronger with regard to the way she said I'll never sign a verdict" and suggested that Juror Number 233 would not have answered similarly if she had not heard Juror Number 55. (Tr. 297).

**¶{239}** On appeal, appellant contends that the trial court used the wrong standard to determine whether these two jurors could be excused based upon their objection to the death penalty. He states that regardless of the United States Supreme Court's modification of the *Witherspoon* test in *Witt*, Ohio enacted R.C. 2945.25(C) to adopt *Witherspoon* and never changed the statute after *Witt*.

**¶{240}** The *Witherspoon* test provided that a potential juror would be excused if: (1) they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt. *Witherspoon v. Illinois* (1968), 391 U.S. 510, 522-523. Ohio then enacted R.C. 2945.25(C), which requires the dismissal of a potential juror for cause when the potential juror "unequivocally stated that under no circumstances will he follow the instructions of a trial judge and consider fairly the imposition of a sentence of death in a particular case."

¶{241} Subsequently, the United States Supreme Court changed the test, holding that the constitutional standard for determining when a prospective juror may be excluded for cause based on his views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath. *Wainwright v. Witt* (1985), 469 U.S. 412, 424.

¶{242} The Supreme Court of Ohio has specifically and repeatedly rejected arguments similar to that presented by appellant here. See, e.g., *State v. Davis* 116 Ohio St.3d 404, 2008-Ohio-2, ¶55; *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, ¶40; *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, ¶61-62; *State v. Wilson* (1996), 74 Ohio St.3d 381, 388. The reason an Ohio trial court does not err in applying *Witt* is that a juror can be excluded for cause under the catchall provision of R.C. 2945.25(O) even when he does not satisfy the *Witherspoon* test embodied in R.C. 2945.25(C). *State v. Beuke* (1988), 38 Ohio St.3d 29, 38; *State v. Buell* (1986), 22 Ohio St.3d 124, 139. As such, appellant's legal argument here is without merit.

¶{243} Regarding the court's exclusion of these two jurors, the defense had no problem with excusing for cause Juror Number 55. (Tr. 296). It was only Juror Number 233 that the defense wished to maintain. As the defense conceded, Juror Number 55 was adamant that she could not impose a death sentence. Thus, there was no error, and even if there were, a defendant cannot take advantage of invited error. *State ex rel. Kline v. Carroll*, 96 Ohio St.3d 404, 2002–Ohio–4849, ¶27 ("a party is not entitled to take advantage of an error that he himself invited or induced the court to make.").

¶{244} As set forth above, Juror Number 233 was against the death penalty. She did say she might consider it if the court told her to or if she had to. However, she stated four times that she could not impose it, *which was her final answer*. (Tr. 253-255, 264, 271, 295). Considering the answers provided by Juror Number 233, the trial court could reasonably find that her views on the death penalty prevented or substantially impaired the performance of her duties. *Witt*, 469 U.S. at 424. A court's decision excusing a juror for cause due to their statements that they could not vote in favor of the death penalty will not be disturbed on appeal unless it is manifestly arbitrary so as to constitute an abuse of discretion. *State v. Brinkley*, 105 Ohio St.3d

231, 2005-Ohio-1507, ¶92. The appellate court must defer to the trial judge who sees and hears the juror. Id. (In fact, appellant does not actually argue that the trial court abused its discretion if *Witt* is the proper standard.) For all of these reasons, this assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER SEVENTEEN

¶{245} Appellant's seventeenth assignment of error states:

¶{246} "APPELLANT WAS DENIED A FAIR TRIAL AND IMPARTIAL JURY AND EQUAL PROTECTION OF THE LAWS WHEN HIS JURY WAS NOT COMPOSED OF A FAIR CROSS-SECTION OF THE COMMUNITY DUE TO RACIALLY DISCRIMINATORY CHALLENGES MADE BY THE STATE AND APPROVED BY THE TRIAL COURT IN VIOLATION OF [THE CONSTITUTION] [CITATIONS OMITTED]."

¶{247} A claim of racially discriminatory use of a peremptory challenge is subject to the three steps set forth in *Batson v. Kentucky* (1986), 476 U.S. 79. First, the opponent of the peremptory challenge must make a prima facie case of racial discrimination, which is accomplished by merely showing that the juror is African-American. Id. at 96-98.

¶{248} Then, the proponent of the challenge must provide a racially neutral explanation for the challenge. Id. A race-neutral explanation for a peremptory challenge is simply "an explanation based on something other than the race of the juror." *Hernandez v. New York* (1991), 500 U.S. 352, 360. It need not rise to the level of a challenge for cause. *Batson*, 476 U.S. at 97. In fact, it has been stated that the explanation need not be "persuasive, or even plausible" as long as the reason is comprehensible and is not inherently discriminatory. *Rice v. Collins* (2006), 546 U.S. 333, 338.

¶{249} If the proponent provides a race-neutral explanation, the trial court must view all the circumstances and determine whether the explanation is merely pretextual and thus whether there was purposeful discrimination. Id. at 98. Although this step entails evaluating the persuasiveness of the proponent's explanation, the burden of persuasion regarding racial motivation rests on the opponent of the challenge. *Rice*, 546 U.S. at 338. Because the decision is largely based upon credibility, we defer to the trial court and do not reverse absent a clearly erroneous decision. See *State v.*

*Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, ¶64; *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, ¶110.

¶{250} Appellant's main argument concerns the state's exercise of a peremptory challenge on Juror Number 31. Both in her jury questionnaire and at voir dire, she stated that she does not believe in capital punishment but then stated that the proper punishment in all aggravated murder cases is death. (Tr. 191-192). When advised that this seemed contradictory, she responded merely, "Um-hum." She then stated again that she was against the death penalty but then changed her answer to "Between, mixed." (Tr. 192). She then stated that the death penalty is appropriate "if someone just up and just murdered you without cause."

¶{251} When asked if she could sign a verdict that gives someone the death penalty, she responded in the negative and stated, "I don't believe in it." (Tr. 196). When asked if she could impose death if she found that the aggravating circumstance outweighed the mitigating factors, she said, "I could" and "Probably, yeah." She then changed her answer and said, "Oh, if I would -- you ask me to sign, could I do it? * * * No, no." (Tr. 197). She then agreed that her views against the death penalty would impair her ability to sit on the case. (Tr. 198).

¶{252} Upon questioning by the defense, she stated that she believed there are cases in which the death penalty is appropriate and that she has no problem following the law and the judge's instructions. (Tr. 212-213). She then stated that if the state did not prove it was appropriate, she still could not sign a life imprisonment option because upon release the same thing could happen again. Defense counsel expressed confusion. (Tr. 219). On further explanation, she stated that she could impose a life option. She was again asked if she could sign a death verdict if the state proved beyond a reasonable doubt that death was appropriate. (Tr. 221). Prior to saying yes, she asked, "Before the judge?" (Tr. 221-222).

¶{253} Thereafter, the court attempted to clarify her position by asking if there was any case in which she could sign a death verdict to which she answered, "Could be." (Tr. 232). After more questioning she agreed that she would sign. (Tr. 233). Besides these expressions on the topic of her views, she disclosed that she saw news about the trial in the last few days but stated that she did not form any opinion of the case therefrom. (Tr. 237). The state challenged Juror Number 31 for cause stating:

¶{254} "She clearly didn't understand what anyone was talking about. She changed her answer back and forth five, six, seven times. First, she said she couldn't sign a verdict, was against capital punishment, and then she changed her mind and changed it back. I couldn't even follow along. I don't think she understood our questions, I don't think she understood what was going on." (Tr. 238).

¶{255} The court agreed that Juror Number 31 was either confused or was in "a hard place." The court stated that it would watch her the next day and if she still did not understand the proceedings, she would be excused for cause. The court also noted that she looked puzzled. (Tr. 239).

¶{256} The next day, Juror Number 31 disclosed that her nephew had been killed in Youngstown only seven months before and that the crime was still being investigated. (Tr. 661-662). The state then asked to challenge her for cause for the reasons previously stated and because she did not list any victims of crime in her questionnaire. (Tr. 751). The state reiterated that she does not seem to know what is going on and is often confused. (Tr. 751-752). The court and the defense opined that she did better than the prior day. (Tr. 752). The court denied the challenge stating that just because it takes her longer to get her thoughts together is not a reason to excuse her for cause. (Tr. 753-752).

¶{257} Thereafter, the state exercised a peremptory challenge on Juror Number 31. In response to the defense's citation to *Batson*, the state pointed to its reasons expressed in its earlier challenge for cause. The state emphasized that she was confused and her nephew's murder was still being investigated. (Tr. 762). The court found that the state presented a racially-neutral reason. The court pointed out that there were complaints about this juror from the beginning. The court then allowed the state's peremptory challenge to stand. (Tr. 763).

¶{258} The trial court's decision was based on the prosecutor's credibility and its own determination of reasonableness. See *Batson*, 476 U.S. at 98; *Frazier*, 115 Ohio St.3d 139 at ¶64; *Bryan*, 101 Ohio St.3d 272 at ¶110. The court was in the best position to evaluate the statements of the prosecutor and also those made by the juror during voir dire. The state provided multiple race-neutral reasons. It was not clearly erroneous for the trial court to have found that those reasons were not pretextual and that the prosecutor's decision was not the result of purposeful discrimination. A

prospective juror's equivocal answers or expressions of uncertainty about impartiality or matters pertinent to the case are sufficiently race-neutral reasons for exercising a peremptory challenge. See, e.g., *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, ¶65 (prospective juror had uncertain position on the death penalty); *State v. Franklin*, 7th Dist. No. 06-MA-79, 2008-Ohio-2264, ¶70-92 (prospective juror's attentiveness and understanding of burden of proof was uncertain). As such, this argument is overruled.

¶{259} Appellant next contends that the state's peremptory challenge of Juror Number 11 was not supported by plausible reasons. In her voir dire, this juror was asked to explain a statement she made regarding the mental state of a defendant. She responded in part: "some people, like they're kind of slow or they had a problem ever since they were born, or maybe they might have snapped." She also noted self-defense or taking vengeance upon someone who hurt a child were reasons to refuse the death penalty. (Tr. 106). She voiced that a doctor should examine a defendant to declare his state of mind at the time of the offense. The prosecutor then noted that the state did not have to prove motive or why the defendant committed the crime, and Juror Number 11 responded, "Right."

¶{260} This juror then agreed to take into consideration all the facts when determining the aggravating circumstances. (Tr. 107). She stated that she would listen to both sides and weigh both options. (Tr. 124). She made a comment about appeals being wrong and too long, noting that sometimes this is good because she has heard about innocent people being freed from death row. (Tr. 130). Thereafter, the state chose to exercise a peremptory challenge on this juror. On the defense's citation to *Batson*, the state proffered the following explanation, which the court accepted as a race-neutral reason:

¶{261} "[T]hroughout the entire interview, I don't feel that Juror No. 11 liked what I had to say. She wasn't listening to certain portions of me. She liked court shows, she mentioned hearing both sides of the story during one portion, and when I explained to her that it was just our burden, she agreed with that, but, however, she always talked about motive, and she seemed very disappointed to us that we didn't have to prove why someone did something." (Tr. 758-759).

**¶{262}** Feeling that a juror was inattentive is a race-neutral reason. The court was present and occupied the best position to judge this. Notably, the defense, upon whom the burden of persuasion remained, did not dispute the statement. See *Rice*, 546 U.S. at 338. A belief that the juror showed disdain for the state's position is also a valid explanation. See, e.g., *State v. Person*, 174 Ohio App.3d 287, 2007-Ohio-6869, ¶33 (state believed that prospective juror made a disdainful facial expression during the State's questions). A belief that a juror was too focused on a non-element such as motive is also valid concern for a prosecutor. The mere fact that she watches court shows may not be a strong reason in itself, but it was accompanied by other valid concerns. For all of these reasons, it cannot be said that the trial court was clearly erroneous in deciding that the state's reasons were not pretextual. See *Frazier*, 115 Ohio St.3d 139 at ¶64; *Bryan*, 101 Ohio St.3d 272 at ¶110.

**¶{263}** Finally, appellant makes an argument concerning Juror Number 301. The state challenged this juror for cause. The trial court denied the challenge but noted that the reasons would survive a *Batson* challenge. (Tr. 442-443). Appellant's contests this. However, the state never did end up exercising a peremptory challenge on Juror Number 301. In fact, this juror sat as an alternate. (Tr. 765). Thus, this argument is without merit. This assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER EIGHTEEN

**¶{264}** Appellant's eighteenth assignment of error contends:

**¶{265}** "APPELLANT WAS DENIED RIGHTS SECURED BY THE [THE CONSTITUTION] [CITATIONS OMITTED] WHEN THE TRIAL COURT FAILED TO MAKE AN ADEQUATE AND ACCURATE RECORD OF THE TRIAL PROCEEDINGS."

**¶{266}** Appellant argues that the juror numbering system created by the court was confusing and pointless (pointless because the names were available to the parties). Appellant also states that there cannot be a meaningful appellate review due to an inadequate record. Appellant also complains that sometimes the five panel members originally identified were different when questioning later began.

**¶{267}** As for the latter argument, Group 7 was initially said to contain the following five juror numbers: 99, 110, 112, 121, and 249. (Tr. 94). Numbers 121 and 301 ended up sitting on the jury as alternates. Appellant states when this panel was called for questioning, it contained the following seven juror numbers: 99, 110, 112,

121, 249, 301, and 262. (Tr. 398-445). First, we point out that Juror Number 112 had been excused prior to jury selection at page 87 due to having young children with no childcare. The mention of this juror once during questioning at page 421 is apparently a typographical error (the transposing of the numbers in 121, whose number is mentioned multiple times during the questioning). Thus, six jurors were involved in group seven at the time of questioning; one of which (Juror Number 99) was excused almost immediately after an in chambers on-the-record discussion about pretrial publicity. (Tr. 405). Appellant did not object to the panel below. In any event, the mere addition of two members to a panel after one was excused is not problematic. As we mentioned above (a fact not mentioned by appellant), that excusal was made on the record. There is no valid argument on appeal here.

¶{268} Group 8 was originally listed as containing numbers: 155, 157, 159, 167, and 253. (Tr. 94). Numbers 157 and 253 ended up sitting as alternates. Appellant points out that when this group was called for questioning, there was a misreference to Juror Number 273. However, the court quickly corrected the list of those present by stating numbers 157, 159, 167, and 253. (Tr. 446). As to this group, Juror Number 290 arrived to questioning late as she said that she had been provided with the wrong time. (Tr. 463). Once again, there was no confusion expressed by defense counsel as to her being a member of this group. And, there is nothing problematic about adding a juror to a panel after another juror is excused prior to questioning. As appellant fails to point out, Juror Number 155 had been excused on the record due to a doctor's certificate. (Tr. 88).

¶{269} Group 9 was originally listed as containing numbers: 172, 173, 175, 176, and 254. (Tr. 94). Appellant complains that when this group was later called, 172 was not questioned but 273 and 278 were. However, Juror Number 172 had been excused prior to questioning due to her job. (Tr. 89). Thus, one of the new jurors was a replacement. Once again, there was no objection to the addition of a sixth juror to the panel. Moreover, Juror Number 254 and Juror Number 273 were excused after individual, on-the-record, in chambers discussions. (Tr. 498-501). Juror Number 278 was excused due to a medical condition. (Tr. 502-505). In fact, no member of this group ended up sitting on the jury.

**¶{270}** Group 10 was originally identified as numbers: 203, 204, 206, 216, and 256. (Tr. 94). Appellant complains that numbers 298, 300, and 303 were also questioned when this group was eventually called. However, defense counsel had no problem with the addition of three panel members to the final group.

**¶{271}** These examples do not establish an inadequate record but merely show that some anticipated groups had jurors who had been excused and thus additional jurors were added. The parties had their voir dire lists. They did not voice objection or even surprise over the additional panel members. Every aspect of how a juror is placed on a panel need not be detailed in the record.

**¶{272}** If some portions of how certain jurors were replaced with others on five-member panels or elsewhere was not clearly stated in the record, defense counsel could have objected at a point when the court could have clarified the matter. As the defense was viewing jury sheets, the process must not have posed a problem, and prejudice has not been established. See *State v. Palmer* (1997), 80 Ohio St.3d 543, 560 (capital defendant's record need not be absolutely complete where prejudice is not shown; failure to record jury view and in-chamber conferences).

**¶{273}** As for the numbering system, the state specified to the court that it had no criticism of the system. Merely because the state apologized to the jurors that the numbering system may seem informal does not indicate an objection to the court about the propriety of the system. (Tr. 216, 263). Defense counsel joked that the system would save him from having to mispronounce names. (Tr. 23). He also told the jury he "hated using these numbers." (Tr. 166). However, the defense did not enter an objection to the court on the employment of the numbering system.

**¶{274}** Thus, defense counsel apparently did not believe a substantial right was affected by the use of juror numbers. Moreover, plain error is not apparent. Other courts have used numbering systems. See, e.g., *State v. Glenn*, 3d Dist. No. 1-06-12, 2008-Ohio-3058, ¶21, fn.2; *State v. Conley* (Mar. 19, 2001), 5th Dist. No. 2000CA188 (upholding number system). Notably, the parties here had the jurors' names as well; so, this was not an anonymous jury, which would also use a numbering system, and even anonymous juries have been upheld. *State v. Hill* (2001), 92 Ohio St.3d 191, 199-200. Thus, appellant's suggestion that it was the numbering system's fault that they did not know that a juror was related to an employee of the prosecutor's office

until later.  (Apt. Br. at 36-37).  The manner of voir dire is within the sound discretion of the trial court.  *State v. Fears* (1999), 86 Ohio St.3d 329, 338 (also stating that jury sequestration during voir dire in a capital case is not required).  Even if an objection had been entered, there is no indication that the trial court abused its discretion in utilizing this number system.

¶{275} As for appellant's complaint here that the peremptory challenges were not limited to those jurors "in the box," no one expressed a problem with this.  (Tr. 757).  In fact, the prosecutor was not alone when it used peremptory challenges on venirepeople who were "outside the box."  (Tr. 760-761).  The defense found it strategic as well.  As such, the defense cannot now complain about the process.  This assignment of error is overruled.

**TRIAL ISSUES**

¶{276} The trial issues are contained in the following five assignments of error: two, six, seven, nine, and ten.

ASSIGNMENT OF ERROR NUMBER TWO

¶{277} Appellant's second assignment of error argues:

¶{278} "APPELLANT WAS DENIED DUE PROCESS, THE ABILITY TO REMAIN FREE FROM CRUEL AND UNUSUAL PUNISHMENTS, AND A TRIAL BY JURY WHEN THE AGGRAVATING CIRCUMSTANCE, BY BEING STRUCTURED IN THE ALTERNATIVE, FAILED TO INSURE A UNANIMOUS FINDING BEYOND A REASONABLE DOUBT.  [CITATIONS OMITTED]"

¶{279} Verdict Form 1A provided as follows:

¶{280} "We the jury in this case, duly impaneled, affirmed, and sworn, find the defendant Bennie L. Adams, guilty of committing the offense of aggravated murder while he was committing, attempting to commit or fleeing immediately after committing or attempting to commit rape, aggravated burglary, aggravated robbery or kidnapping, and Bennie L. Adams was the principal offender in the aggravated murder, in violation of R.C. 2901.01(B),(C), 2923.03."

¶{281} The court instructed similarly.  (Tr. 749-750, 766).  As the state points out, appellant did not object below, and thus, on appeal, he can only raise plain error or ineffective assistance of counsel (raised in the seventh assignment of error). Appellant argues that these instructions are erroneous, claiming that each underlying

felony constituted a separate specification and that the jury had to unanimously agree that he committed the same underlying felony. Since the charge was framed in the alternative and since the underlying felonies were dismissed due to statute of limitations issues, it is unknown whether the jury unanimously found that the murder was committed during the same underlying felony. For instance, it is possible that three jurors thought the murder was committed only while attempting or committing or fleeing after rape, three thought it was committed only during the aggravated burglary, three thought it was committed only during the aggravated robbery, and three thought it was committed only during the kidnapping. He thus argues there was a patchwork verdict as a result of duplicity.

¶{282} Appellant utilizes cases holding that there is no error in giving an instruction such as this. He tries to distinguish one case by noting that *one* of the reasons the Supreme Court found the instructions to lack prejudice was because the jury had also found the defendant guilty of the predicate felonies and thus it was clear that the jury unanimously found the defendant guilty of each type of felony underlying the murder. See, e.g., *State v. Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, ¶82-83. See, also, *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, ¶65 ("It was not necessary for the jurors to agree unanimously that the murder occurred while all three of those offenses were being committed or while Johnson was fleeing afterwards."). As appellant points out, this is unlike the situation here where the underlying felonies were never presented to the jury as separate offenses. This, however, does not lead to the inescapable conclusion that separate guilty verdicts on the underlying offenses are mandatory.

¶{283} In fact, *Williams* also relied on a United States Supreme Court case. See id., citing *Schad v. Arizona* (1991), 501 U.S. 624. In that case, the High Court held that it was not a due process violation to instruct a capital jury in the alternative *where the instruction did not just contain different predicate offenses but also gave the jury the option of either felony murder or premeditation. Schad*, 501 U.S. at 637. The Court found that these options could be considered merely means of satisfying a single mens rea as opposed to being independent elements. Id. at 637, 643-644 (and plurality holding that mental states associated with premeditated murder and felony murder could be considered moral equivalents). The Court held:

**¶{284}** "Different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict." Id. at 631-632.

**¶{285}** Moreover, the Ohio Supreme Court has issued more recent opinions on the topic of unanimity where the defendant was not also convicted of the underlying offenses. In one case, the Court determined that the jury was not required to unanimously agree as to which criminal offense the defendant intended to commit during a burglary. *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, ¶37. The Court noted that "[a]lthough Crim.R. 31(A) requires juror unanimity on each element of the crime, jurors need not agree to a single way by which an element is satisfied." Id. at ¶38. See, also, id. at ¶67 (stating that the burglary statute proscribes a single crime that may be carried out in more than one manner or method and holding that Ohio's burglary statute is similar to Arizona's definition of first-degree murder in the *Schad* case in that both use alternative bases for the intent element).

**¶{286}** In a case even more on point, the Ohio Supreme Court was presented with an aggravated murder capital case where the trial court instructed that the death must occur while committing, attempting to commit, or fleeing immediately after committing "a kidnapping, or aggravated robbery, or aggravated burglary." *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, ¶184. The defendant argued that this instruction deprived him of a unanimous verdict because some of the jurors may have convicted him of aggravated murder based upon the underlying offense of kidnapping and others based upon the aggravated robbery and still others based upon the aggravated burglary. Id. at ¶187. The Court disagreed and found that the instruction was not erroneous as jurors need not agree on a single means for committing an offense. Id. at ¶187-188, citing *Schad*, 501 U.S. 624. Thus, appellant's argument must be overruled as the trial court was permitted to instruct on murder and the specification by listing the underlying felonies in the alternative as the Ohio Supreme Court has ruled that jury unanimity is not required on each underlying felony in a felony murder situation. Id. at ¶187-189.

**¶{287}** Similar to appellant's final argument here, the defendant in *Davis* also invoked the *Apprendi* and *Ring* cases by arguing that any finding of fact making a

defendant eligible for the death penalty must be made unanimously by a jury. Id. at ¶189, citing *Apprendi v. United States* (2000), 530 U.S. 466 (defendant cannot be exposed to penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone) and *Ring v. Arizona* (2002), 536 U.S. 584 (trial judge cannot make findings of fact on aggravating circumstance as factual findings are within province of jury). The *Davis* Court rejected this argument as those cases dealt with judge's findings when there was no jury verdict. Id. at ¶189. Here as in *Davis*, there is a unanimous verdict that an aggravated felony murder was committed. This assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER SIX

¶{288} Appellant's sixth assignment of error provides:

¶{289} "THE TRIAL COURT ERRED IN PERMITTING THE INTRODUCTION OF TESTIMONY OF THE VICTIM'S FEAR OR APPREHENSION OF APPELLANT, AND APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL FAILED TO OBJECT TO SUCH TESTIMONY AT TRIAL AFTER AN ADVERSE RULING ON A PRETRIAL MOTION, IN VIOLATION OF [THE CONSTITUTION] [CITATIONS OMITTED]."

¶{290} The first issue appellant raises here is the trial court's involvement in the motion in limine hearing. Appellant states that the trial court's neutrality is in question because the court asked questions at a hearing rather than requiring the prosecutor to elicit the responses necessary to determine whether witnesses should be permitted to testify as to the victim's fear of appellant. He notes that a trial judge should refrain from taking the role of an advocate in order to avoid the appearance of impartiality. See *Maag v. Maag* (Dec. 19, 2001), 7th Dist. No. 01AP761 (discussing the trial court's actual introduction of evidence in a report which neither party had reviewed).

¶{291} However, appellant failed to object to the trial court's questions. Additionally, the trial court "may interrogate witnesses, in an impartial manner, whether called by itself or a party." Evid.R. 614(B). "A trial judge has a duty to see that truth is developed and therefore should not hesitate to pose a proper, pertinent, and even-handed question when justice so requires." *In the Matter of Gray* (Apr. 20, 2000), 8th Dist. Nos. 75984, 75985. A trial court's questioning of a witness is not deemed partial for purposes of Evid.R. 614(B) merely because the evidence elicited during the

interrogation was damaging to one of the parties. Id. Rather, it is presumed that the trial court acted impartially in questioning a witness as to a material fact or to develop the truth. Id. See, also, *Jenkins v. Clark* (1982), 7 Ohio App.3d 93, 98. Moreover, leading questions are acceptable. Id. at 97.

¶{292} In fact, an appellate court's concern with trial court questioning essentially revolves around the effect of the court's involvement on a jury. *State ex rel. Wise v. Chand* (1970), 21 Ohio St.2d 113, 119. In a bench trial or a motion hearing, these concerns are not raised. See *Gray*, 8th Dist. Nos. 75984, 75985.

¶{293} Here, the court was attempting to ascertain preliminary issues outside the presence of the jury regarding whether there was a foundation for certain testimony. The court's involvement in the questioning of the witnesses did not project the appearance of impartiality. The leading nature of certain questions facilitated the process and focused the inquiry to those issues the court believed were relevant at that point in time. Consequently, this argument is without merit.

¶{294} The next issue raised is the propriety of the court's ruling on the motion in limine. Such a ruling is merely preliminary. *State v. Hill* (1996), 75 Ohio St.3d 195, 202-203. Evidentiary issues are subject to the trial court's sound discretion. *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, ¶104. Furthermore, the request in a motion in limine to preclude the testimony on the victim's fear must be renewed at trial. See id. See, also, *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶59 (notwithstanding motion in limine, objecting party must challenge evidence during trial when issue is presented in full context).

¶{295} As appellant failed to do so, he relies on the plain error doctrine at this point. Pursuant to Crim.R. 52(B), the appellate court may recognize plain error if substantial rights are affected. To recognize plain error, a reviewing court must find obvious error affecting substantial rights in that the error was clearly outcome determinative. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, ¶62. See, also, *Hancock*, 108 Ohio St.3d 57 at ¶ 60. Plain error is a discretionary doctrine to be used with the utmost of care by the appellate court only in exceptional circumstance to avoid a manifest miscarriage of justice. *Noling*, 98 Ohio St.3d 44 at ¶62. Appellant also raises (in his seventh assignment of error) ineffective assistance of counsel regarding these arguments.

¶{296} At trial, various witnesses were permitted to testify that the victim feared appellant. Appellant contends that the victim's fear was not relevant or admissible. However, a witness can testify to their personal impression of a person's emotional state. *State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, ¶100.

¶{297} Moreover, there is a state of mind hearsay exception contained in Evid.R. 803(3). Pursuant to that rule, a witness can testify to the declarant's statement of their then-existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed.

¶{298} As appellant acknowledges, testimony on a victim's fear of a defendant can be relevant to prove nonconsensual sex. As rape was one of the underlying felonies here, the victim's state of mind was relevant. State of mind can similarly be used here to show that appellant's entry into her apartment and his use of her ATM and her vehicle occurred without the victim's consent.

¶{299} For these reasons, there was no problem with the testimony that the victim feared appellant or was apprehensive of him. See *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, ¶74 (victim's fear of husband is admissible under Evid.R. 803(3) hearsay exception), citing *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 21-22. See, also, *State v. Miller*, 96 Ohio St.3d 384, 2002-Ohio-4931, ¶40-46 (witness can testify that victim told him that if she "would come up shot in the head, that bastard did it," reversing appellate court which had held that statement was too detailed).

¶{300} Appellant then contends that even if the testimony that the victim feared him was admissible, the witnesses should not have been permitted to provide specific instances as examples of why the victim feared him. Although a witness can disclose that a victim stated she feared the defendant, *the state of mind exception is not the vehicle* for exposing why the declarant held a particular state of mind as this further fact would deal with memories or beliefs to prove the state of mind. See *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6435, ¶101 (cannot testify why victim was going to end relationship); *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 21 (cannot testify victim said she was afraid of defendant because he threatened her). (This is not to say that there is no other vehicle for exposing incidents that the jury could use to infer why a person fears another).

**¶{301}** The state argues that the witnesses did not specifically state why the victim feared appellant and claims that appellant fails to elucidate where this occurred on the record. Appellant's brief states that he is taking issue with testimony on acts such as: he sent the victim an odd card, often watched her out his window, and called her so often that she had to change her telephone number. (Tr. 90-93, 368-369, 372).

**¶{302}** First, we note that even where there is error in admitting the reason for a victim's fear of a defendant, a claim of plain error is defeated where there exists a large volume of evidence against the defendant. See *Ahmed*, 103 Ohio St.3d 27 at ¶76. There is a large volume of evidence against appellant here. This would also serve to refute the prejudice for an ineffective assistance of counsel argument.

**¶{303}** Regardless, much of the contested testimony was not even hearsay. For instance, Mr. Robinson testified that the victim showed him a card appellant sent to her. He saw that it was signed, "Bennie" and that it stated, "To a confused young lady." The card itself could not be located by the police, but the card's envelope bearing appellant's handwriting was used as evidence by the state at trial. Mr. Robinson's recounting his first-hand viewing of the card and what it said is not hearsay. Rather, it is merely his relation of his personal observation of certain evidence. Likewise, testimony on appellant watching the victim was derived from the witnesses' own experiences of seeing appellant staring at the victim. (Sept. 19, 2008 Hrg. Tr. 84; Tr. 93). The same is true with the witnesses' testimony that the victim implemented a system for her friends to hang up once and then call back so she knew it was them and the testimony that the victim eventually changed her telephone number. (Tr. 92). These were first-hand observations of events.

**¶{304}** In any event, there are other exceptions arguably applicable here. The hearsay exception for the present sense impression allows testimony on "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness." Evid.R. 803(1). The hearsay exception for an excited utterance allows testimony on "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). To be admissible under Evid.R. 803(2), a statement must concern an occurrence observed by the declarant that was startling enough to produce a nervous

excitement in the declarant and must be made before there was time for such excitement to lose domination over her reflective faculties. *State v. Huertas* (1990), 51 Ohio St.3d 22, 31.

¶{305} Mr. Robinson testified at the motion in limine hearing that the victim called him immediately after every call appellant made to her. She was anxious, angry, upset, and frustrated when she spoke to Mr. Robinson. (Sept. 19, 2008 Hrg. Tr. 76-77). The victim's relation of the telephone calls to him was reactive rather than reflective. (Sept. 19, 2008 Hrg. Tr. 85.) Her statements could reasonably be classified as either present sense impressions or excited utterances. See Evid.R. 803(1), (2); *Huertas*, 51 Ohio St.3d at 31 (affirming finding that a statement made forty-five minutes after the event but while the declarant was still agitated and in serious pain and had not calmed down to be an excited utterance).

¶{306} As to the testimony of Ms. Sergeff concerning the fact that the victim's fear was the result of appellant calling and watching the victim, a foundation was not sufficiently laid for either the present sense or the excited utterance exception at the initial hearing. (Sept. 19, 2008 Hrg. Tr. 96-99). However, her testimony was repetitive of Mr. Robinson's testimony for which a proper foundation had been laid. Plus, as aforementioned, her testimony on fear of appellant was admissible to show that the victim did not consent to sex with him or to his presence in her apartment. Her other testimony was essentially her own personal observations of appellant watching or approaching the victim, the victim's unusual caller identification system, and her own intent to spend the night with the victim the day before the murder due to the victim's fear. For all of these reasons, this assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER SEVEN

¶{307} Appellant's seventh assignment of error states:

¶{308} "APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY [THE CONSTITUTION] [CITATIONS OMITTED] WHEN HIS TRIAL COUNSEL FAILED TO FULFILL A LITANY OF DUTIES AND WERE NOT FUNCTIONING AS COUNSEL."

¶{309} In seeking reversal for alleged ineffective assistance of trial counsel, the defendant must establish deficient performance which caused prejudice to the defense. *Strickland v. Washington* (1984), 466 U.S. 668, 687; *State v. Bradley* (1989),

42 Ohio St.3d 136, 142. This statement breaks down into a two-pronged test: deficiency and prejudice are both required.

¶{310} In order to establish that counsel's performance was deficient, the defendant must demonstrate that the performance fell below an objective standard of reasonable representation by the commission of a serious error. *State v. Keith* (1997), 79 Ohio St.3d 514, 534. Counsel is presumed competent. *State v. Thompson* (1987), 33 Ohio St.3d 1, 10. We do not use hindsight to second-guess instances of trial strategy that backfire as there is a wide range of professional competence and of appropriate trial tactics. *State v. Carter* (1995), 72 Ohio St.3d 545, 558.

¶{311} To then demonstrate that he was prejudiced by the deficient performance, the defendant must prove that there exists a reasonable probability that were it not for counsel's errors, the outcome of the proceedings would have been different. *Keith*, 79 Ohio St.3d at 534. In evaluating prejudice, we thus consider whether our confidence in the outcome is undermined. *Bradley*, 42 Ohio St.3d at 142.

¶{312} Each of the allegations of ineffective assistance of counsel here are subsumed by other assignments where they were raised and more specifically argued by appellant and where they were either found not to have constituted errors or were found to lack prejudicial effect. Specifically, appellant states that counsel should have filed a pretrial motion to suppress the Allies' identification testimony, which claim was rejected in assignment of error number four. He then states that counsel should have filed a motion to change venue due to pretrial publicity, which issue was resolved in assignment of error number eight.

¶{313} Appellant complains that counsel failed to object to the time limits on voir dire, which was addressed in assignment of error number one, and failed to object to the voir dire record and the investigation into juror misconduct, which arguments were overruled in assignments of error numbers fourteen and eighteen. Appellant then states that counsel should have objected to the court's use of the *Witt* standard in excusing jurors, which allegation was rejected in assignment of error number fifteen.

¶{314} Appellant raises the failure to object to the submission of aggravated murder to the jury with the option of choosing between four different underlying felonies, which submission was found to be proper in assignment of error number two.

Appellant states that counsel should have objected to state of mind and excited utterance evidence, which was addressed in assignment of error number six.

¶{315} Appellant states that counsel should have filed a pretrial motion challenging the constitutionality of the death penalty, which issue will be addressed in assignment of error number twenty. He also states that counsel should have complained about the proportionality review, which issue will be addressed in assignments of error numbers sixteen and twenty. Hence, this assignment of error is overruled based upon the overruling of the related assignments of error.

ASSIGNMENT OF ERROR NUMBER NINE

¶{316} Appellant's ninth assignment of error contends:

¶{317} "THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING APPELLANT'S MOTION FOR MISTRIAL IN THAT PREJUDICIAL COMMENTS FROM THE STATE'S WITNESS DENIED APPELLANT A FAIR TRIAL IN VIOLATION OF [THE CONSTITUTION] [CITATIONS OMITTED]."

¶{318} Based upon the investigation of Ms. Tenney's murder, appellant was identified as the person who had kidnapped, raped, and robbed another woman a few months prior. He was thereafter convicted of the offenses against the other woman and spent many years in prison. Before the 2008 trial for the murder of Ms. Tenney, the court heard evidence on a motion in limine to determine if evidence of these other acts could be presented at trial. The court ruled that these other acts were inadmissible.

¶{319} During trial, the defense was cross-examining a detective about an exhibit that showed who was present at the line-up. Defense counsel specifically asked the detective to read the witnesses who were there. The detective began, "You mean [name of victim from 1986 rape case], the witnesses, Sandra Howard [Allie, the ATM witness] - - ." (Tr. 229). The defense interrupted and approached the bench, asking for a mistrial. The defense first took issue with the detective's use of the prior victim's name. (Tr. 230). The defense also complained that when he had asked the detective if he could think of any further conversations with appellant's girlfriend, the detective responded, "Not about this case." (Tr. 221).

¶{320} As further support for the mistrial motion, the defense complained that the detective referred to a suppression hearing. That is, defense counsel had asked

the detective if he testified a couple times already in this case, to which the detective responded, "I have." (Tr. 191). Counsel continued, "Back in July, once in September?" The detective responded, "At suppression hearings, yes." (Tr. 192). At that point, defense counsel pointed out to the detective that he had not asked for that kind of hearing.

¶{321} The court overruled the motion for mistrial. (Tr. 230). Appellant now argues that the mistrial should have been granted based upon these three comments. The granting or denial of a motion for mistrial rests in the sound discretion of the trial court. *State v. Treesh* (2001), 90 Ohio St.3d 460, 480, citing Crim.R. 33. A mistrial is not warranted in a criminal case merely because some error or irregularity occurred. Id. The granting of a mistrial is necessary only when a fair trial is no longer possible. Id.

¶{322} First, appellant did not object to the "[n[ot about this case" comment when it was made. In any event, it was merely a statement of fact. It does not refer to a prior rape, kidnapping, and robbery case. It does not even refer to the girlfriend being questioned about appellant. As the state points out, it could merely mean that they spoke about general life topics (her father was an active police officer at the time).

¶{323} As for the reading of the prior victim's name, this was invited by defense counsel. See *Center Ridge Ganley, Inc. v. Stinn* (1987), 31 Ohio St.3d 310, 313. The detective did not bring in other acts evidence that had been barred from this trial. He merely answered a factual question about the contents of an exhibit or about who was present at the line-up. As the state notes, the other victim's name was set forth right after the reading of a detective's name and a lawyer's name and then another lawyer's name was read thereafter. Furthermore, there is absolutely no indication that the jurors sitting in 2008 would be familiar with a 1985 rape victim's name.

¶{324} Finally, that the jury heard that a suppression hearing had been held did not deprive appellant of his right to a fair trial. No objection was entered when the statement was made. In fact, it was defense counsel who informed the jury that the detective had previously testified in this case twice. Most murder cases involve suppression hearings. There was no implication that evidence had been suppressed from the jury's viewing, i.e. that appellant's suppression motion was successful.

Prejudice is not apparent. The court did not abuse its discretion in refusing to grant a mistrial on the grounds raised.

¶{325} Lastly, appellant points to another portion of the detective's testimony. The prosecutor asked what led the detective to think that appellant was suspect in the initial burglary attempt at Ms. Tenney's apartment. The detective answered, "From what the victim told me that she was having problems --." The defense objected, and the court sustained the objection. (Tr. 243). The prosecutor continued, "So from what she had told you?" and "Without saying what she said?" (Tr. 243-244). The defense did not object to these final statements.

¶{326} On appeal, appellant argues that this was a deliberate attempt to prejudice the jury. However, the objection was sustained before the detective could explain what the victim told him. The defense did not ask for any further remedying. See *State v. Davie* (1997), 80 Ohio St.3d 311, 322 (where objection is sustained, defense must seek curative instruction to raise issue thereafter). The detective's statement that the victim "told me that she was having problems - -" is not so prejudicial to require a mistrial. As a matter of fact, if completed it would only have been repetitive of other admissible testimony about the victim having problems with appellant. Finally, this argument is placed under the mistrial argument. Yet, this was not included as a ground in the request for a mistrial below. It occurred after the mistrial request, and appellant does not cite to any further motion thereafter. For all of these reasons, this assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER TEN

¶{327} Appellant's tenth assignment of error alleges:

¶{328} "THE TRIAL COURT ERRED IN FAILING TO GIVE REQUESTED JURY INSTRUCTIONS, AND DENIED APPELLANT RIGHTS UNDER [THE CONSTITUTION] [CITATIONS OMITTED]."

¶{329} Appellant sets forth two arguments here. First, appellant contends that the court should have granted his request for a jury instruction on the lesser included offense of involuntary manslaughter, which entails causing a death as a proximate result of committing or attempting to commit a felony or a misdemeanor. R.C. 2903.04(A) (first degree felony) and (B) (third degree felony).

**¶{330}** Appellant was convicted of aggravated felony murder, which entails purposely causing the death of another "while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, terrorism, or escape." R.C. 2903.01(B). A person acts purposely when it is his specific intention to cause a certain result. R.C. 2901.22(A).

**¶{331}** An offense may be a lesser included offense of another if: (1) it carries a lesser penalty, (2) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed, and (3) some element of the greater offense is not required to prove the commission of the lesser offense. *State v. Deem* (1988), 40 Ohio St.3d 205, 209. Involuntary manslaughter is a lesser included offense of aggravated murder, the difference being the mental state. *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, ¶132.

**¶{332}** Even though an offense may be a lesser included offense, an instruction on the lesser offense is required only if the evidence presented at trial would reasonably support both an acquittal of the crime charged and a conviction upon the lesser included offense. *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, ¶192. The trial court is to view the evidence in the light most favorable to the defendant when determining if an instruction on a lesser included offense is warranted. Id. An instruction on a lesser included offense is not warranted merely because "some evidence" is presented to support the lesser offense. Id. Rather, a court must find "sufficient evidence" to allow a jury to reasonably reject the greater offense and find the defendant guilty on a lesser included offense. Id. Where there is clear evidence to support the greater offense, the lesser offense instruction can be denied. *State v. Carter* (2000), 89 Ohio St.3d 593, 602.

**¶{333}** Here, the victim was appellant's neighbor, who knew him well and could easily identify him after a rape or robbery. The victim had bruises on her face suggesting suffocation and ligature marks around her neck suggesting she was also strangled with a cord. Appellant was found in possession of many stolen objects that belonged to the victim such as her television, car keys, bank card, and potholder (with head and pubic hair attached that was consistent with that of the victim). He drove her car to a bank and used her bank card. The car was then brought back to their

apartment. In the trunk was a telephone cord said to be consistent with the ligature marks on the victim's neck and wrists. The victim had repeatedly rebuffed appellant's attempts to express interest in her life. She feared appellant. Appellant's semen was found in the victim's vagina.

¶{334} That he killed her purposely while committing, attempting to commit, or fleeing immediately after committing a rape, a robbery, a burglary, and a kidnapping is clearly established by the evidence. "No specific evidence submitted at trial raised the issue of involuntary manslaughter." See *State v. Smith* (2000), 89 Ohio St.3d 323, 331. As such, a lesser included offense instruction on involuntary manslaughter was not required in this case.

¶{335} We note appellant's argument here that there was evidence that Horace Landers may have been involved in the victim's death. He states that if Mr. Landers killed the victim, this is evidence tending toward establishing appellant's involvement only in involuntary manslaughter. However, the jury specifically found beyond a reasonable doubt that appellant was the principal offender in the aggravated murder when they convicted him of the death specification. See *Conway*, 108 Ohio St.3d 214 at ¶139 (alternatively finding any error in failing to instruct on a certain lesser included instruction was harmless because a jury decision on another instruction showed a lack of prejudice). Thus, this argument is without merit.

¶{336} Appellant's other argument presented under this assignment deals with prior case law concerning the treatment of circumstantial evidence. At the time the offense was committed, courts operated under the following premise: "Circumstantial evidence relied upon to prove an essential element of a crime must be irreconcilable with any reasonable theory of an accused's innocence in order to support a finding of guilt." *State v. Kulig* (1974), 37 Ohio St.2d 157, syllabus.

¶{337} Appellant asked for the jury to be instructed accordingly. However, the trial court refused based upon the fact that *Kulig* has long since been overruled. In 1991, the Ohio Supreme Court joined various state and federal courts that rejected *Kulig*'s circumstantial evidence rule. *State v. Jenks* (1991), 61 Ohio St.3d 259, 272. The Court held that the probative force of circumstantial evidence is equivalent to that of direct evidence, announcing:

**¶{338}** "Since circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt. Nothing more should be required of a fact-finder."

**¶{339}** "In every criminal case, the jury is asked to weigh all of the admissible evidence, both circumstantial and direct, to determine if the defendant is guilty beyond a reasonable doubt. Hence, there is but one standard of proof in a criminal case, and that is proof beyond a reasonable doubt. This tenet of criminal law remains true, whether the evidence against a defendant is circumstantial or direct." Id. at 272-273 (citations omitted).

**¶{340}** Appellant now argues that applying this changed standard to his case violates the prohibition on the retroactive application of a new legal rule of evidence to a prior offense. See *State v. Webb* (1994), 70 Ohio St.3d 325, 330, fn.1 (although the Ex Post Facto clause does not itself apply to the judicial branch, due process similarly constrains a court's power to apply certain precedent to cases arising prior to the announcement of such precedent). However, this argument has been rejected by the Ohio Supreme Court in *Webb*.

**¶{341}** In that case, the defendant argued that the new *Jenks* rule on circumstantial evidence altered a legal rule of evidence, decreased the quantum of proof necessary to convict, and could not be applied retroactively pursuant to *State v. Jones* (1981), 67 Ohio St.2d 244, 249. Id. at 330. The *Webb* Court stated that the retroactivity rule announced in *Jones* was fatally undercut by the United States Supreme Court. Id. at 331, citing *Collins v. Youngblood* (1990), 497 U.S. 37, 43 (new evidentiary rules can be applied in trials for crimes committed before the change).

**¶{342}** The *Webb* Court concluded that the retroactive application of *Jenks* does not punish as a crime an act previously committed, which was innocent when done or make more burdensome the punishment for a crime after its commission or deprive one charged with a crime a defense available according to the law at the time the act was committed. Id. Because *Jenks* changed only the evidentiary standard and because *Collins* established that new evidentiary rules can be applied retroactively, a rule changing the quantum of proof required for conviction may be applied in a trial for a crime committed prior to the rule's announcement. Id.

¶{343} As such, appellant's retroactivity argument is without merit. The trial court did not err in refusing to instruct the jury as to the law on circumstantial evidence at the time the offense was committed. This assignment of error is overruled.

## PENALTY PHASE ISSUES

¶{344} The penalty phase issues are contained in the following four assignments of error: sixteen, nineteen, twenty, and twenty-one.

## ASSIGNMENT OF ERROR NUMBER SIXTEEN

¶{345} Appellant's sixteenth assignment of error provides:

¶{346} "AN INDEPENDENT WEIGHING OF THE AGGRAVATING CIRCUMSTANCE VERSUS THE MITIGATING FACTORS DEMONSTRATES THAT THE AGGRAVATING CIRCUMSTANCE DOES NOT OUTWEIGH THE MITIGATING FACTORS BEYOND ANY REASONABLE DOUBT, AND THE DEATH SENTENCE IS NOT APPROPRIATE AND MUST BE VACATED."

¶{347} At the sentencing phase, appellant presented his mother's testimony. She stated that he went to prison in 1986 and was released in 2004. (Tr. 38-39). After his release, he obtained gainful employment, and helped her some monetarily. (Tr. 40).

¶{348} His adult daughter testified that while he was imprisoned, appellant always sent Christmas and birthday cards. (Tr. 116). When he was released, they lived together. He helped her obtain a house, provided her money, and helped take care of her children. (Tr.118, 120, 122). She noted that he rarely expressed emotions. (Tr. 121).

¶{349} The mother of this child testified that he has always acted with love toward their daughter. (Tr. 51). She acknowledged that he did not help support them in the ten years before he went to prison. (Tr. 52, 65). She opined that he is a different person than he was before he went to prison. (Tr. 56-57).

¶{350} Two prison instructors testified that appellant was a model student and helper; he was dependable, he was intelligent, and he became their "friend." One admitted that appellant was disciplined while in prison for an infraction with a female employee of the prison. (Tr. 102). Notably, this instructor had been fired for smuggling inmate mail out of the prison. (Tr. 104).

¶{351} Appellant's parole officer of two years testified that appellant was granted release from parole in 2006 after no violations were incurred. (Tr. 109). Counsel urged that appellant's education, rehabilitation, employment, and familial ties establish that the death penalty would not be appropriate.

¶{352} Pursuant to R.C. 2929.05(A), we must review the record to determine whether the evidence supports the finding that the aggravating circumstance was established beyond a reasonable doubt. We must also review and independently weigh all the evidence and consider the offense and the offender to determine whether the aggravating circumstance outweighs the mitigating factors and whether the sentence of death is appropriate. R.C. 2929.05(A). In determining if the sentence is appropriate, we consider if it is excessive or disproportionate in comparison to other cases in which the death penalty has previously been imposed. Id.

¶{353} The aggravating circumstance here is that the offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated robbery, or aggravated burglary, and he was the principal offender in the commission of the aggravated murder. See R.C. 2929.04(A)(7). There is evidence that appellant killed the victim while or after raping her, kidnapping her, robbing her and burglarizing her residence. A rational juror could also find that appellant was the principal offender.

¶{354} Specifically, appellant was the victim's downstairs neighbor, who often watched her and called her late at night. She feared him. She changed her number soon after the calls began. He once slipped an odd card under her door. Her ATM card was found in his pocket the morning her body was found. There was credible evidence that he used the victim's car and ATM card the night of her murder. Her car was then parked back in front of their apartment. Her keys were found in his bathroom garbage can. Her potholder was found in his apartment. The potholder contained red head and pubic hair consistent with that of the victim; it also contained hair from an African-American. Her stolen television was discovered in appellant's room with his fingerprints on it. Semen discovered in the victim's vagina was found to match appellant's DNA. As the victim knew appellant, a juror could conclude that to rape her would require him to kill her. Ligature marks on her neck and wrists establish that a cord was used, showing the death was not an accidental result of the other felonies.

¶{355} In conclusion, the evidence supports the jury's finding that the aggravating circumstance was established beyond a reasonable doubt. Thus, we move to weigh the evidence to determine if the aggravating circumstance outweighs the mitigating factors and determine the appropriateness of the imposition of death.

¶{356} The jury shall consider, and weigh against the aggravating circumstance, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following mitigating factors: (1) whether the victim induced or facilitated the offense; (2) whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation; (3) whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform his conduct to the law; (4) the youth of the offender; (5) the offender's lack of a significant history of prior criminal convictions and delinquency adjudications; (6) if the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim; and (7) any other factors relevant to the issue of whether the offender should be sentenced to death. R.C. 2929.04(B).

¶{357} Appellant asks us to give some weight to his relationship with his family. He points out that he bettered himself during his long prison term by obtaining some education and working, although the state argued that this was calculated in order to obtain parole. Once released from incarceration, appellant found employment, helped his mother a bit, helped obtain a house for his daughter, and led a law-abiding life. The defense urged that he was rehabilitated, but the trial court opined that appellant was not actually rehabilitated because he has shown no remorse. Moreover, there is no evidence of victim inducement, offender duress or provocation, or diminished mental capacity. See R.C. 2929.04(B)(1)-(3). The offender was not youthful at the time of the offense or at trial. See R.C. 2929.04(B)(4). The offender did not lack a significant history of convictions. In fact, one of his witnesses indicated that he was always getting in trouble, and he had committed another kidnapping, robbery, and rape close in time to the one in the case at bar. See R.C. 2929.04(B)(5). The jury also found that he was the principal offender. See R.C. 2929.04(B)(5).

¶{358} As for the general nature of the offense and the character of the defendant, the trial court noted that when appellant's advances were continually rebuffed by his neighbor, he took what he wanted by force knowing he would have to kill her because she knew him. Nothing in the nature and circumstances of the offense is mitigating. See *State v. Craig*, 110 Ohio St.3d 306, ¶145. Upon independently reviewing the entire record, there is proof beyond a reasonable doubt that the aggravating circumstance outweighed the mitigating factors.

¶{359} Contrary to appellant's other suggestion here, the court's statement that appellant coveted the victim was not an improper creation of an aggravating circumstance. It is true that the nature and circumstances of the offense only enter the weighing process on the side of mitigation. See R.C. 2929.04(B); *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 355-356. However, when making the statements regarding appellant's actions, the trial court did not purport to make the nature and circumstances an aggravating circumstance. Rather, the trial court specified that it was considering the evidence as it related to the aggravating circumstance. According to *Wogenstahl*, this is required under R.C. 2929.03(D)(1), which provides:

¶{360} "[The court, and the trial jury if the offender was tried by a jury, *shall consider * * * any evidence raised at trial that is relevant to the aggravating circumstances* the offender was found guilty of committing or to any factors in mitigation of the imposition of the sentence of death, *shall hear testimony and other evidence that is relevant to the nature and circumstances of the aggravating circumstances* the offender was found guilty of committing, the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, and any other factors in mitigation of the imposition of the sentence of death, and shall hear the statement, if any, of the offender, and the arguments, if any, of counsel for the defense and prosecution, that are relevant to the penalty that should be imposed on the offender." Id. (Emphasis added.)

¶{361} The trial court here did this by reviewing the evidence relevant to the aggravating circumstance and essentially setting forth why the nature and circumstances of the offense are not mitigating in any way.

¶{362} Lastly, we are to conduct a proportionality review to determine whether the sentence is excessive or disproportionate in comparison to other cases in which

the death penalty has previously been imposed. In *State v. Eley* (Dec. 20, 1995), 7th Dist. No. 87CA122, the defendant had shot and killed the owner of a grocery store during a robbery attempt committed with the assistance of an accomplice. He had claimed that he only intended to hit the clerk's shoulder as he thought the clerk had a gun. We upheld his death sentence. Id., affirmed in *State v. Eley* (1996), 77 Ohio St.3d 174, 190 (proportionate to other murder-robbery cases), citing, e.g., *State v. Tyler* (1990), 50 Ohio St.3d 24.

¶{363} In *State v. Spivey* (Jan. 13, 1997), 7th Dist. No. 89CA172, the nineteen-year-old defendant broke into a woman's home, and killed her before stealing various items and fleeing in the victim's automobile. There was testimony in mitigation that the defendant lacked substantial capacity to conform to the law. The defendant was convicted of aggravated murder with the death penalty specification being that the murder was committed during the course of an aggravated burglary, aggravated robbery, and grand theft of a motor vehicle. We upheld his sentence. Id.

¶{364} In *State v. Twyford* (Sept. 25, 1998), 7th Dist. No. 93J13, the defendant believed the victim raped his girlfriend's daughter. After deceiving the victim into believing that they were going hunting, he shot the victim in the back and then shot up the corpse and took identifying objects to hide the victim's identity. Twyford was convicted of aggravated murder, kidnapping, and aggravated robbery. We affirmed the death sentence in that case. Id.

¶{365} In a murder-robbery-kidnapping case reviewed by the Supreme Court, the defendant tied up his former housemate, beat him, stole the contents of his wallet and his car, drove him to a remote area, and buried him alive. The Court found the death sentence proportionate to other cases and cited various prior cases. *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, ¶113, citing, e.g., *State v. Moore* (1998), 81 Ohio St.3d 22, 44. The Supreme Court has also upheld the proportionality of the death sentence in a rape-murder case where the defendant beat, raped, and strangled the victim. See *State v. Mason* (1998), 82 Ohio St.3d 144, 170,

¶{366} Here, we have a defendant who was in his late-twenties at the time of the murder. He essentially stalked his young neighbor until he eventually forced his way into her apartment, hit her, raped her, strangled her with a cord, tied her wrists, suffocated her, stole her car, dumped her body in the river, tried to get money from her

bank account, returned to her apartment to steal her television, and cleaned up trace evidence with her potholder. After considering all of the evidence presented throughout the case, the imposition of the death penalty here is proportionate to that imposed in other similar cases.

ASSIGNMENT OF ERROR NUMBER NINETEEN

¶{367} Appellant's nineteenth assignment of error alleges:

¶{368} "APPELLANT WAS DENIED DUE PROCESS AND THE ABILITY TO REMAIN FREE FROM CRUEL AND UNUSUAL WHEN THE TRIAL JUDGE REFUSED APPELLANT'S REQUESTED 'MERCY' INSTRUCTION. [CITATIONS OMITTED]"

¶{369} "If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. Absent such a finding, the jury shall recommend that the offender be sentenced to life imprisonment * * *." R.C. 2929.03(D)(2).

¶{370} Appellant argues that this statement improperly bars the jury from considering whether death is "appropriate," and he urges that a mercy instruction should have been provided to the jury. In discussing mercy or sympathy, the United States Supreme Court has held:

¶{371} "An instruction prohibiting juries from basing their sentencing decisions on factors not presented at the trial, and irrelevant to the issues at the trial, does not violate the United States Constitution. It serves the useful purpose of confining the jury's imposition of the death sentence by cautioning it against reliance on extraneous emotional factors, which, we think, would be far more likely to turn the jury against a capital defendant than for him." *California v. Brown* (1987), 479 U.S. 538, 543.

¶{372} As appellant acknowledges, Ohio has applied this reasoning to exclude a mercy instruction, holding:

¶{373} "Permitting a jury to consider mercy, which is not a mitigating factor and thus irrelevant to sentencing, would violate the well-established principle that the death penalty must not be administered in an arbitrary, capricious or unpredictable manner."

*State v. Lorraine* (1993), 66 Ohio St.3d 414, 417-418 (the statute eliminates the subjective state of mind that the issue of mercy generally adds to a jury's deliberation).

¶{374} Thus, a capital defendant in Ohio is not entitled to a mercy instruction. Id.  See, also, *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, ¶220; *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, ¶190; *State v. Carter* (2000), 89 Ohio St.3d 593, 607.  We are bound by this law.

¶{375} We also note that, contrary to appellant's contention, R.C. 2929.03(D)(2) does not preclude a jury from considering whether death is appropriate.  See, e.g., *State v. Williams* (1995), 73 Ohio St.3d 153, 173; *State v. Seiber* (1990), 56 Ohio St.3d 4, 19 (Ohio's statutes do not constitute a mandatory sentencing scheme which unconstitutionally precludes a jury from deciding if death is, in fact, an appropriate sentence).  Accordingly, appellant's arguments here are without merit.

ASSIGNMENT OF ERROR NUMBER TWENTY

¶{376} Appellant's twentieth assignment of error states:

¶{377} "APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE [THE CONSTITUTION] [CITATIONS OMITTED] WHEN HIS TRIAL COUNSEL FAILED TO FILE MOTIONS TO CHALLENGE THE CONSTITUTIONALITY OF OHIO'S DEATH PENALTY."

¶{378} On February 28, 2008, defense counsel filed a motion to dismiss the death penalty specification on the grounds of cruel and unusual punishment. Appellant provided information on botched executions and asked for an evidentiary hearing for the presentation of evidence on the inhumanity of lethal injection and the three-drug protocol.  The three-drug cocktail is no longer used in Ohio, and thus, appellant no longer raises this issue.

¶{379} On appeal, appellant sets forth other claims regarding the constitutionality of the death penalty that he believes should have been raised by trial counsel in the motion to dismiss the specification.  Appellant generally criticizes the Ohio Supreme Court's review in death cases, characterizing it as cursory and claiming the Court regularly summarily overrules arguments concerning Ohio's statutory death penalty scheme and the constitutionality of lethal injection.  See *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, ¶282-283; *State v. Frazier*, 115 Ohio St.3d 139,

2007-Ohio-5048, ¶243, 235.    However, this complaint is not within our province to address.

¶{380} The state asks us to generally point out here that the Ohio Supreme Court has stated that Ohio's death penalty scheme is constitutional in all respects. *State v. Bey* (1999), 85 Ohio St.3d 487, 502.   We now turn to the more specific arguments appellant outlines here.   Before doing so, we note that appellant concedes that many of the issues are without merit under various Ohio precedents and are only being set forth here in order to avoid waiver for future federal habeas proceedings. See *State v. Stojetz* (1999), 84 Ohio St.3d 452, 468 (regarding issue that was admittedly raised only to preserve habeas review).

¶{381} First, appellant argues that the implementation of the death penalty in Ohio is the "ultimate form of racial discrimination."   He states that less than twenty percent of the population in Ohio is black, but more than 50% of death row inmates in Ohio are black.   He notes that it is not just the race of the defendant that affects a jury's death decision but also the race of the victim, stating that juries subconsciously work under the assumption that a white life is "worth more" than black life.

¶{382} This argument can find no support in rulings made by the Ohio Supreme Court.   See *State v. Johnson* (2000), 88 Ohio St.3d 95, 121, 127, sub-proposition of law 9(B); *State v. Fears* (1999), 86 Ohio St.3d 329, 331, 364, sub-proposition of law 11(B).    Moreover, the Court has held that there must be evidence of specific discriminatory intent.  *State v. Bey* (1999), 85 Ohio St.3d 487, 503.  See, also, *State v. Steffen* (1987), 31 Ohio St.3d 111, 124-125 (mere statistics are insufficient). No such evidence has been illuminated here.   This holding, on the lack of specific discriminatory intent, would apply as well to appellant's complaint that the prosecutor has unbridled charging discretion.  See *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, ¶103.

¶{383} Second, appellant states that the death penalty is unconstitutional because it does not actually serve the three main purposes it is said to accomplish: deterrence, incapacitation, and retribution.  As to deterrence, he proposes that capital defendants rarely contemplate the death penalty before committing their crimes and claims there is no evidence that the existence of the death penalty decreases murder rates.   As to incapacitation, he states that death is not the least restrictive means

especially when considering the fact that the government does not always convict the right person. Arguments regarding these first two purposes are continually rejected by the Supreme Court. See id., citing *State v. Jenkins* (1984), 15 Ohio St.3d 164, 168. As to retribution, appellant urges that life without parole can satisfy this need now that the human mind has evolved new standards of decency and notes the continuation of botched executions. However, this is still considered a valid purpose in the typical case. Cf. *Atkins v. Virginia* (2002), 536 U.S. 304, 321 (dealing with mentally disabled individuals).

¶{384} Third, appellant alleges that the two-phase process with the same jury is improper. For instance, he states that counsel's credibility is negatively affected by having to death qualify jurors in voir dire, then argue their client's innocence at trial, and then argue against death in the penalty phase. This argument has been rejected by this court and the Ohio Supreme Court. *State v. Gerish* (Apr. 22, 1999), 7th Dist. No. 92CA85, citing *Jenkins*, 15 Ohio St.3d 164.

¶{385} Fourth, appellant complains that a death qualified jury is more prone to convict and does not constitute a fair cross-section of the community. As appellant acknowledges, this argument has also been rejected. *State v. Zuern* (1987), 32 Ohio St.3d 56, 63. See, also, *Gerish*, 7th Dist. No. 92CA85, citing *State v. Maurer* (1984), 15 Ohio St.3d 239, 244. We shall not second-guess the Ohio Supreme Court's application of *McCree* as appellant suggests. See *Zuern*, 32 Ohio St.3d at 63, citing *Lockhart v. McCree* (1986), 476 U.S. 152.

¶{386} Fifth, appellant complains that R.C. 2929.03(D)(1) is unconstitutional because once a defendant requests a mental examination, he has no control over whether the jury views it. However, this process has been upheld in Ohio. See *Mink*, 101 Ohio St.3d 350 at ¶107, citing *State v. Buell* (1986), 22 Ohio St.3d 124, 138 (there is no constitutional infirmity with giving the defendant the option of choosing to expose himself to the risk of potentially incriminating investigations).

¶{387} Sixth, appellant states that Ohio's death penalty statutes and Crim.R. 11(C)(3) encourage guilty pleas as the court can dismiss death specifications upon accepting a plea. The Court has rejected this argument multiple times. *Buell*, 22 Ohio St.3d at 138, citing *State v. Nabozny* (1978), 54 Ohio St.2d 195, ¶1 of syllabus (allowing trial court discretion to dismiss specifications for pleading defendant does not

coerce defendant to waive right to jury trial) and *State v. Weind* (1977), 50 Ohio St.2d 224, 299 (a defendant who pleads is not guaranteed his death specifications will be dismissed).

¶{388} Seventh, appellant contends that there are no adequate guidelines for weighing the aggravating circumstance with the mitigating factors and that the term "outweigh" encourages the jury to use a standard similar to preponderance of the evidence rather than the required standard of beyond a reasonable doubt. These contentions have been addressed by this court and the Supreme Court. *Gerish*, 7th Dist. No. 92CA85, citing *Jenkins*, 15 Ohio St.3d at 171. As all of appellant's contentions have been disposed of by precedent, counsel was not ineffective by failing to raise these issues in the pretrial motion. This assignment of error is without merit.

¶{389} (Appellant also alleges that Ohio fails to require the jury to make a decision on the appropriateness of the death penalty and complains about the lack of a mercy option instruction, but these topics are addressed in assignment of error number nineteen. Appellant raises concerns about the proportionality review and alleges a lack of adequate court review of death sentences, but these topics are addressed in assignment of error number twenty-one.)

ASSIGNMENT OF ERROR NUMBER TWENTY-ONE

¶{390} Appellant's twenty-first assignment of error contends:

¶{391} "APPELLANT WAS DENIED DUE PROCESS AND EQUAL PROTECTION OF THE LAW, AND LIBERTIES PROTECTED BY [THE CONSTITUTION] [CITATIONS OMITTED] AND, THE DEATH SENTENCE IMPOSED UPON APPELLANT IS CRUEL AND UNUSUAL IN VIOLATION OF [THE CONSTITUTION] [CITATIONS OMITTED]."

¶{392} As aforementioned, the reviewing court must consider whether imposition of the death penalty in the case is excessive or disproportionate to the penalty imposed in similar cases. R.C. 2929.05(A). Appellant states that we cannot properly do this unless the juries are required to list the mitigating factors and state their reasoning process so each case can be used in the proportionality review of future cases. However, we have rejected the argument that the jury should be constitutionally required to set forth its rationale behind its weighing of the aggravating circumstance and the mitigating factors. *Gerish*, 7th Dist. No. 92CA85. "[S]uch

information is not an indispensable ingredient in assisting us to determine whether the imposition of a death sentence is disproportionate to sentences imposed for similarly proscribed courses of conduct." *Jenkins*, 15 Ohio St.3d at 177. Thus, this argument is overruled.

¶{393} Appellant also complains here that there is a flaw in the proportionality review because there is no comparison of death-eligible defendants who received life with death-imposed defendants to ensure the proportionality of sentences. He states that his case is similar to a recent local case where the defendant was not indicted on a death specification. See *State v. Beshara*, 7th Dist. No. 07MA37, 2009-Ohio-6529 (defendant robbed and then kidnapped an elderly woman by placing her in her own car trunk, drove her to a secluded location, removed her from the trunk, and ran over her twice in order to kill her).

¶{394} Following the precedent of this court and the Ohio Supreme Court, this argument lacks merit. *Gerish*, 7th Dist. No. 92CA85, citing *State v. Green* (1993), 66 Ohio St.3d 141; *State v. Davis* (1992), 63 Ohio St.3d 44; *State v. Twyford* (Sept. 25, 1998), 7th Dist. No. No. 93J13; *State v. Palmer* (Aug. 29, 1996), 7th Dist. No. 89-B-28. "No reviewing court need consider any case where the death penalty was sought but not obtained or where the death sentence could have been sought but was not." *State v. Steffen* (1987), 31 Ohio St.3d 111, 124. See, also, *State v. Hutton*, 100 Ohio St.3d 176, 2003-Ohio-5607, ¶94 (other case is not a "similar case" if defendant did not receive death penalty). Accordingly, this assignment of error is meritless.

¶{395} For the foregoing reasons, the judgment of the trial court is hereby affirmed.

Donofrio, J., concurs.
Waite, P.J., concurs.